THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL PADGETT, Defendant-Appellant.

First District (3rd Division)   No. 1—91—1914

Opinion filed June 30, 1993.—Rehearing August 11, 1993.

Michael J. Pelletier and Manuel S. Serritos, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb, Eileen O'Neill, and Laura Bertucci, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE TULLY delivered the opinion of the court:

Defendant, Michael Padgett, was indicted for the murder of his estranged wife, Renee Padgett, on February 22, 1990, in violation of section 9—1(a)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1) (now codified, as amended, as 720 ILCS 5/9—1(a)(1) (West 1992))). Following a jury trial in the circuit court of Cook County, defendant was found guilty, convicted and sentenced to 28 years' imprisonment. Pursuant to Supreme Court Rule 603 (134 Ill. 2d R. 603), defendant now appeals the judgment of conviction to this court.

We affirm the conviction and sentence.

### FACTUAL BACKGROUND

One fact remains uncontroverted in this case: on February 22, 1990, defendant shot and killed Renee Padgett. Defendant asserts that this act was done in self-defense. The State submits that defendant's actions amounted to first degree murder.

Defendant testified to the following sequence of events at trial. Defendant related that about one week prior to the incident, his wife had moved out of their house located at 10414 South Parnell Street in Chicago and moved in with her brother. However, Mrs. Padgett returned to the couple's residence a few days later.

Defendant stated that he had dinner with his wife and that afterwards they watched television. At approximately 8 p.m., defendant noticed a change of mood in Mrs. Padgett. She informed him that she was going to the store to purchase detergent. Noting the worsening weather, defendant offered to go to the store for his wife, but she insisted otherwise. Defendant heard his wife's car return to their house's garage at around 11:30 p.m. Defendant testified that when Mrs. Padgett did not return to the house within five minutes, he became worried and retrieved his .357 magnum from a drawer upstairs and went to the garage. Earlier in the proceedings, defendant explained how the neighborhood in which the couple lived had undergone a severe change for the worse, with increased gang and drug activity, muggings, and home invasions. Once while defendant was at work, Mrs. Padgett and the couple's children had been robbed inside their home at gunpoint.

After turning on the patio lights and walking outside, defendant stated that he peered into the garage and observed his wife sitting behind the wheel of their car with a half pint of liquor. After Mrs. Padgett had taken a few sips, defendant asked her why she was drinking. According to defendant, Mrs. Padgett, belligerent and intoxicated, responded that she would come in when she wanted to. Hearing her response, defendant decided to leave "it alone and started walking back to the house."

Defendant further testified that as he returned to the house, he heard his wife start up the car and the garage door open. Worried about his wife driving in an inebriated state in a developing snow storm, defendant waited outside on the porch stoop in order to flag her down. Mrs. Padgett drove the car out of the garage and stopped in the alley. Defendant then walked toward the car.

Defendant stated that when he was approximately 10 feet from the car, he observed his wife pointing a .25-caliber handgun at him. Believing that Mrs. Padgett was going to kill him, defendant raised his gun and started shooting in her direction, emptying all six rounds from it. As he fired, defendant testified that he ran and ducked out of Mrs. Padgett's apparent line of fire and shot the gun as he faced the car's passenger side. The automobile lurched forward and struck a fence. Defendant walked over to the car and looked in; inside the car,

he saw that his wife appeared injured. Defendant returned to the house and called 911. Having worked for Illinois Bell, defendant told the operator that there was a fire, knowing that paramedics would respond quicker to a fire emergency. After he made the call, defendant stayed inside the house to await the arrival of the authorities.

On the date of the incident, Officers Michael Jedkowski, Gerard Droba and Walter Muszynski of the Chicago police department responded at around 11:30 p.m. to the reported shooting. Officer Jedkowski testified that upon arriving at the alley behind the house, he and the two other officers found a woman who had been shot slumped over the steering wheel of a 1986 Buick Skylark. After more officers arrived on the scene, Officer Jedkowski, along with other officers, went up to the house. Officer Jedkowski stated that defendant answered the door and informed him that he had called the police and had shot his wife during an argument. Defendant also told the officers that the gun he used was in the kitchen, whereupon defendant led the officers into the kitchen and handed the gun to Officer Jedkowski. Officer Jedkowski examined the gun and found that it contained six expended shells. At this point, defendant was placed under arrest and advised of his *Miranda* rights. Officer Jedkowski testified that he then asked defendant if he had any other guns in the house. Defendant said that he did have more guns and told the officers the location of the weapons, which were recovered by the officers.

Officer Jedkowski further testified that in a conversation he had with defendant at the police station, defendant said that he had an argument with his wife and that when she went outside to her car, defendant took out his .357-caliber handgun and went outside to speak to her. While defendant was talking to his wife, she pointed a .25-caliber pistol at him and defendant started firing his gun.

Officer Droba testified that when he found Mrs. Padgett, she was still alive in her car and that he stayed with her until the ambulance came. About seven hours later, Mrs. Padgett died at the hospital.

Detective John McMurray of the Chicago police department testified that on the evening of the shooting he transported defendant from the crime scene to the fifth district police headquarters. After Detective McMurray informed defendant of his *Miranda* rights, defendant explained to the detective that he and his wife had been fighting periodically for some time. On the night of the shooting, when Mrs. Padgett returned home, defendant went to the garage because his wife had been threatening to do something drastic. Detective McMurray stated that defendant told him that while he and Mrs. Padgett were arguing in the garage, she pointed a pistol at him.

Upon seeing the gun drawn, defendant began firing at his wife. Defendant said that he fired the gun until it was empty, as he was trained to do so when he served in the Marine Corps in Viet Nam. Defendant then stated to Detective McMurray that after his wife's car crashed into a fence, he reached into the car and felt for her pulse. Unable to find her pulse, defendant turned off the car, went in and called the police.

Detective Edmond Leracz of the Chicago police department testified that he examined the automobile that Mrs. Padgett was found in. Detective Leracz found both the driver and passenger windows were shattered. There were bullet holes in both the front and rear windows. The detective also stated that he noticed a bullet hole in the area between the rear window and the side window. Additionally, there were bullet holes on the inside of the driver's door and just above the arm rest.

Officer Joseph Codina, a crime lab technician with the Chicago police department, testified that an inspection of the .25-caliber pistol found in Mrs. Padgett's car failed to reveal the presence of any fingerprints.

Dr. Mary Jembelic, an assistant medical examiner with the Cook County medical examiner's office, testified that on February 24, 1990, she performed an autopsy on Renee Padgett. Dr. Jembelic found two gunshot wounds: one to the chest and another to the back left side of the head. Upon first examining the wounds, Dr. Jembelic did not find any evidence of close-range firing. Evidence of close-range firing would indicate that a gun was anywhere from next to the skin to about four feet away when fired at a victim. Dr. Jembelic had considered that any such evidence might have been washed away from the back of the head during the course of Mrs. Padgett's treatment. Subsequently, Dr. Jembelic performed a microscopic examination on a skin sample taken from the area of the head wound. This examination revealed the head wound to be a contact wound, indicating that the gun was held against the skin when fired. In addition, a toxicology analysis of Mrs. Padgett's blood indicated a blood-alcohol level of .014, indicating a very small amount of alcohol in the body.

Dr. Jembelic wrote two autopsy reports, an original version, dated May 18, 1990, and an amended version, dated June 15, 1990. The original report was written prior to microscopic examination and states that no indicia of close-range firing was found. The amended report, written after the microscopic examination, is the same as the original report, and the only difference is that the amended report discloses the fact that the head wound was a contact wound.

## ISSUES PRESENTED FOR REVIEW

On appeal, defendant argues that: (1) he was denied a fair trial by the State's disclosure of an autopsy report just prior to trial; (2) the trial court committed reversible error in denying his motion *in limine*, allowing the State to introduce evidence of other weapons; (3) he was denied a fair trial because of allegedly improper statements made by the prosecution in closing argument; and (4) his sentence of 28 years' imprisonment was excessive and an abuse of discretion by the trial court.

## OPINION

We first turn to defendant's argument that he was denied a fair trial by the prosecution's disclosure of the amended autopsy report just prior to trial. Supreme Court Rule 412, which addresses the question of when the State must disclose evidence, provides, in pertinent part, as follows:

> "(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:
>
> * * *
>
> (iv) any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons, and a statement of qualifications of the expert[.]
>
> * * *
>
> (d) The State shall perform its obligations under this rule as soon as practicable following the filing of a motion by defense counsel." (134 Ill. 2d Rules 412 (a)(iv), (d).)

The rule's purpose is to afford the accused protection against surprise, unfairness and inadequate protection. (*People v. Hinton* (1984), 122 Ill. App. 3d 89, 460 N.E.2d 791.) Compliance with Rule 412 is mandatory and is accomplished only if the State notified the defense of the alleged incriminating statement or evidence promptly and in so doing exercised due diligence. (*People v. Steidl* (1991), 142 Ill. 2d 204, 568 N.E.2d 837, *cert. denied* (1991), 502 U.S. 853, 116 L. Ed. 2d 125, 112 S. Ct. 161.) The only circumstance that excuses failure to disclose information is when a prosecutor is unaware of the existence of the evidence prior to trial and could not become aware of it

through the exercise of due diligence. (*People v. Kradenych* (1980), 83 Ill. App. 3d 547, 404 N.E.2d 488.) Thus, discovery violations occur when a prosecutor suppresses evidence that goes to either the guilt or innocence of the accused, after there has been a request for its production. *People v. Manzo* (1989), 183 Ill. App. 3d 552, 539 N.E.2d 237.

In the case *sub judice*, there is no evidence that the State suppressed the evidence that defendant requested. It is uncontroverted that the prosecutor first spoke to Dr. Jembelic on the morning of trial and was only then given the amended autopsy report. Upon receiving the amended report, the State immediately tendered it to defense counsel. Such action is clearly within both the meaning and spirit of Rule 412's requirement that the "State *** perform its obligations under [the] rule *as soon as practicable.*" (Emphasis added.) (134 Ill. 2d R. 412(d).) Accordingly, we find that the State complied with the requisites of Rule 412. We also reject defendant's contention that he was prejudiced by the trial court's refusal to grant a continuance. Our review of the record on appeal indicates the defense counsel never actually requested, either orally or in writing, a continuance and, thus, defendant cannot now argue that he was prejudiced by not receiving such a continuance.

Finally, assuming, *arguendo,* that the trial court's actions were somehow in error, we fail to perceive how defendant was prejudiced. At oral argument of this case, defendant's appellate counsel suggested that had defendant known of the evidence proving that the bullet wound to the back of Mrs. Padgett's head was a contact wound, he could have testified differently or proceeded otherwise. In other words, defendant could have changed his story. We know of no rule of law that recognizes such prejudice as legitimate.

Defendant next submits that the trial court committed reversible error in denying his motion *in limine,* allowing the State to introduce evidence of other weapons. At trial, the trial judge permitted the State to introduce into evidence three other guns, a pellet gun and various types of ammunition found by the police at defendant's residence; none of these items were used in the shooting at issue in this case.

We begin our examination of this issue by noting that "before evidence of any kind is admissible, it must be relevant. [Citations.] Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 487-88, 485 N.E.2d 1292; see also Fed. R. Evid. 401.) The State cites several

cases for the proposition that it is proper to admit into evidence guns or other items of physical evidence seized at a defendant's arrest as relevant to the arrest details. (See, *e.g., People v. Washington* (1984), 127 Ill. App. 3d 365, 468 N.E.2d 1285.) However, in these cases the other items were taken from the defendants at the time of their arrests and being placed into custody. In this case, defendant had already been arrested, warned pursuant to *Miranda*, and given his version of the events to the police. Thus, the arrest was a *fait accompli* when the police located the additional weaponry. Consequently, the cases cited by the State are inapplicable to the case at bar. Furthermore, we believe the introduction of these unrelated weapons to be totally irrelevant to the issue of whether defendant intentionally killed his wife with the gun he handed over to the police. Therefore, the trial court erred in admitting into evidence these items.

Although the trial court erred in admitting these weapons into evidence, we are satisfied beyond a reasonable doubt that this evidence did not contribute to defendant's conviction. There was more than ample evidence of defendant's guilt. Consequently, we find that the complained-of error was harmless. *People v. Rickard* (1981), 99 Ill. App. 3d 914, 425 N.E.2d 1317.

Still to be considered is defendant's position that he was denied a fair trial because of the improper comments made by the State in closing argument. In reference to allegedly improper prosecutorial remarks made in closing argument, the Illinois Supreme Court in *People v. Cisewski* (1987), 118 Ill. 2d 163, 514 N.E.2d 970, stated:

> "In reviewing the defendant's allegations of error here, we first note that a prosecutor is allowed a great deal of latitude in making the closing argument [citations], and the trial court's determination of the propriety of the argument will generally be followed absent a clear abuse of discretion [citation]. To constitute reversible error, the complained-of remarks must have resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different. [Citation.] In reviewing allegations of prosecutorial misconduct, the closing arguments of both the State and the defendant must be examined in their entirety and the complained-of comments must be placed in their proper context." *Cisewski*, 118 Ill. 2d at 175-76.

See also *People v. Thompkins* (1988), 121 Ill. 2d 401, 521 N.E.2d 38, *cert. denied* (1988), 488 U.S. 871, 102 L. Ed. 2d 156, 109 S. Ct. 187.

The first allegedly improper remark is contained in the following exchange:

"[PROSECUTOR]: Judge Karnezis also is going to tell you, I believe, that a person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.

Now, reasonable belief means a person acting as a reasonable person.

[DEFENSE COUNSEL]: Objection.

THE COURT: I will instruct the jury.

[PROSECUTOR]: I believe the Judge will instruct you as to what reasonable belief is. It is not what [defendant] believed. He does not set community standards. It is what a reasonable person believes."

Subsequently, in rebuttal argument the State's co-prosecutor, over defense objection, stated: "It is what the community decides is reasonable, not what is going on in this man's head." In response, the trial judge again stated: "I will instruct the jury."

■ We would agree that the above statements of law provided by the prosecutors are less than hornbook definitions. However, we believe that the trial judge made it clear to the jury that it was he who was to instruct it on law. Furthermore, the trial court did properly instruct the jury on the law of self-defense. Thus, any error which might have occurred here was cured by such admonitions and proper instructions. *People v. Lewis* (1990), 198 Ill. App. 3d 976, 556 N.E.2d 697.

The second allegedly improper comment is contained in the following colloquy:

"[PROSECUTOR]: If you believe what [defendant] wants you to believe about that he is justified in shooting this woman then we better all be scared because you are going to have to —

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

[PROSECUTOR]: Because you will have to go home and lock your doors because this is like the old west and all you have to do is say somebody pulled a gun on you to get off with this.

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained."

■ We believe these comments to be inappropriate, designed only to inflame the passions of the jury and appeal to its fears. (See *People v. Wilson* (1984), 123 Ill. App. 3d 798, 463 N.E.2d 890.) Nevertheless, we find this improper comment to have been cured by the trial

judge's admonitions and instructions to the jury. *Lewis*, 198 Ill. App. 3d 976, 556 N.E.2d 697.

■ With regard to the final comments defendant cites as improper, dealing with alleged misstatements of fact, we find that such argument is waived. "Preservation of an issue on appeal mandates both the objection at trial and the inclusion of the issue in the post-trial motion." (*People v. Arsberry* (1993), 242 Ill. App. 3d 1034, 1041, 611 N.E.2d 1285, citing *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) As defendant failed to make objections at trial to all but one of these comments, argument with respect to these comments is deemed waived. Regarding the one comment that was objected to at trial, such comment is not cognizable on appeal as defendant failed to specifically raise an objection to it in his post-trial motion and, therefore, it is also waived. *People v. David* (1986), 141 Ill. App. 3d 243, 261, 489 N.E.2d 1124; see also *People v. Phillips* (1989), 186 Ill. App. 3d 668, 682, 542 N.E.2d 814; *People v. Pendelton* (1989), 185 Ill. App. 3d 768, 777, 542 N.E.2d 386.

■ Finally, defendant submits that his sentence of 28 years' imprisonment was excessive and an abuse of discretion by the trial court. Our thorough review of the record reveals that the trial judge took into careful consideration what he termed as defendant's "exemplary life" at the time of sentencing. We believe the trial court made a thoughtful analysis of defendant's personal background, history of continuous employment, honorable military service in Viet Nam, lack of a prior criminal record and prospect of rehabilitation. Section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1) provides that the offense of first degree murder is punishable by a term of imprisonment of not less than 20 years and not more than 60 years. Therefore, defendant's sentence was well within both the statutorily approved range of possibilities and the trial court's discretion. *People v. O'Neal* (1988), 125 Ill. 2d 291, 531 N.E.2d 366.

For the aforementioned reasons, we affirm the judgment of the circuit court.

Affirmed.

RIZZI and CERDA, JJ., concur.