Michael J. PADGETT, Petitioner–Appellant,

v.

William O'SULLIVAN, et al., Respondents–Appellees.

No. 94–2957.

United States Court of Appeals, Seventh Circuit.

Argued May 15, 1995.

Decided Aug. 30, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 15, 1995.

Harold J. Krent (argued), John S. Delika-nakis (student), Chicago–Kent College of Law, Chicago, IL, for petitioner-appellant.

Arleen C. Anderson, Asst. Atty. Gen., Office of the Attorney General, Chicago, IL, and Martha E. Gillis (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for respondents-appellees.

Before CUMMINGS, BAUER, and ROVNER, Circuit Judges.

BAUER, Circuit Judge.

Michael Padgett was tried and convicted for the murder of his wife. The court sentenced him to serve a prison term of twenty-eight years. He petitioned for a writ of habeas corpus declaring that his trial was rendered fundamentally unfair by the trial court's denial of his request for a continuance. The district court denied the petition. We agree with the district court's conclusion albeit for different reasons.

The facts of this case are set forth at length in the Illinois Appellate Court's opinion affirming Padgett's conviction. *People v. Padgett*, 248 Ill.App.3d 1018, 188 Ill.Dec. 412, 618 N.E.2d 982 (1993). We therefore discuss only the facts which bear on the disposition of this petition.

Illinois authorities indicted and tried Padgett for killing his wife, Renee. That Padgett shot his estranged wife on February 22, 1990, was never in dispute. The issue at trial was whether Padgett's actions were justified as self-defense. Padgett related the following story in his defense.

Though they had been separated for about a week, Padgett and Renee had dinner on the night of the shooting. At about 8:00 p.m., Renee announced that she was going out to purchase detergent. Padgett heard her car pull into the garage at about 11:30 p.m., but when she failed to enter the house, Padgett went to the garage armed with his .357 caliber magnum revolver.

In the garage, Padgett observed Renee in her car drinking some kind of liquor straight out of the bottle. When Padgett asked her to come inside, she became belligerent, and Padgett determined that she was intoxicated. Padgett decided to ignore her and turned to go back inside the house. Just then, Renee started the car's ignition and began backing the car out of the garage. Concerned about her driving in an inebriated condition, Padgett went to confront her in the alley outside of the garage. As he came to within ten feet of the car, he observed Renee pointing a .25 caliber gun at him. Still in possession of his revolver, Padgett fired off six rounds in Renee's direction. As he fired the weapon, Padgett was moving from right to left towards the passenger side of the car. Fatally wounded, Renee lost control of the car which came to rest against a fence.

Padgett returned to his house and called the 911 emergency number. After his call, he did not return to Renee's car to help her but waited instead inside his house. When the police arrived shortly thereafter, Padgett was placed under arrest. Renee Padgett died at the hospital approximately seven hours after the shooting.

Testimony from the prosecution's experts supplied ample reason to doubt Padgett's explanation. Detective Edmond Leracz of the Chicago Police Department testified that both the driver's side and passenger's side windows had been shattered; bullet holes were found in the front and rear windows and in the area between the rear and side windows; and more bullet holes were found inside the driver's door and just above the arm rest. A crime lab technician testified that no fingerprints were found on Renee's .25 caliber handgun.

Further evidence was presented by Dr. Mary Jumbelic, the medical examiner who performed the autopsy on Renee. Her examination revealed two gunshot wounds: one to the chest and one to the back left side of Renee's head. Jumbelic originally reported that neither of the shots was a close range firing *i.e.*, within four feet. Believing, however, that evidence of the gunshot's proximity might have been washed away during Renee's medical treatment, Jumbelic performed a microscopic examination of the skin in the area of the head wound. This examination established that the head wound was indeed the result of a close range firing. Jumbelic subsequently amended her report to reflect this conclusion.

The amendment of Jumbelic's report lies at the heart of Padgett's petition. The first report was dated May 18, 1990. The amended report was dated June 15, 1990. The amended report was not delivered to the prosecutor, however, until the day Jumbelic was scheduled to testify at trial, several months after its preparation. At that time, the prosecutor immediately tendered it to defense counsel.

Padgett's attorney argued for exclusion of the amended report based on the prejudice created by the delay. The trial court rejected Padgett's objection. Padgett's attorney then stated, "If the court allows it, we are stating for the record that we are taken by surprise. We are not prepared to move forward at this time." Padgett's attorney then asked for a brief recess so he could discuss the report with Padgett. After he had done so, counsel stated that he was ready for trial.

The Illinois Appellate Court affirmed the conviction. In addressing the amended report, the court concluded that the exchange described above did not amount to a request for a continuance but that even if it did, in disclosing the amended report to Padgett immediately, the state had complied with its obligations under Illinois law. The court also held that Padgett's claim that if he had known about the amendment, he could have changed his story, did not constitute cognizable prejudice.

Padgett then filed this habeas corpus petition. In it, he clarified that he was preju-

diced not because he had been precluded from changing his story, but because he had been prevented from presenting an expert to rebut Jumbelic's testimony. The district court did not reach the prejudice issue because it found that Padgett's claim had been adjudicated on independent and adequate state grounds. Since the Illinois Appellate Court had disposed of Padgett's claim based on Illinois Supreme Court Rule 412, Padgett's petition failed to implicate any cognizable federal right.

On appeal, Padgett contends that the district court erred in finding his claim precluded by the independent and adequate state grounds doctrine. He maintains that irrespective of the prosecutor's state law obligations to disclose evidence, Padgett still had a due process right to a continuance in order to obtain an expert witness to rebut the new evidence. By failing to grant a continuance, the trial court supposedly deprived him of this right. The state concedes that the independent and adequate state grounds doctrine is not dispositive of Padgett's argument. At issue then is whether the state court's denial of the continuance deprived Padgett of a fair trial.

The state maintains that the remarks of Padgett's defense counsel did not constitute a request for a continuance. This is an unduly harsh and literal reading of the exchange. In the context of what had just transpired, we believe that it is eminently fair to read the statement, "[w]e are not prepared to move forward at this time," as a request for a delay in the proceedings. Having said that, we cannot read into counsel's remarks as much as Padgett would like. That is, nothing in counsel's statement could possibly be construed to inform the court that he sought to call a rebuttal expert. Rather, the only sensible interpretation of the statement would be that Padgett's attorney needed some time to revise his cross-examination of Jumbelic. In denying the continuance, the trial court implicitly concluded that Padgett did not need additional time to formulate a responsive cross-examination. We therefore review this decision to determine whether it robbed the trial of due process.

■ There are indeed instances in which the failure to grant a continuance may rise to the level of a due process violation. *Bell v. Duckworth*, 861 F.2d 169, 170 (7th Cir.1988). To successfully show such a violation on collateral review, the petitioner must demonstrate that the denial was arbitrary and fundamentally unfair. *Manlove v. Tansy*, 981 F.2d 473, 476 (10th Cir.1992). The resulting prejudice must be such that had the continuance been granted, there is a reasonable probability that the verdict would have been different. *Id.* at 478. Our review leads us to believe that Padgett cannot meet this burden.

■ Padgett describes the evidence of the close range firing as the "linchpin" of the state's case. Such a characterization, however, understates the strength of the state's case. Aside from the amendment of the medical examiner's report, Padgett's tale of self-defense had been and remains contradicted in several ways. Granting Padgett a continuance so that he could effectively counter Jumbelic's conclusions about the close range firing would not have been likely to have changed the outcome because the other discrepancies between his story and the physical evidence would continue to have remained unexplained. For instance, Padgett's entire rationale for chasing after Renee was that he could tell she was drunk and did not want her to drive in that condition. Yet tests confirmed that Renee's blood-alcohol level was .014%, indicating the presence of only a very small amount of alcohol in her body.

Padgett also fails to account for the evidence pertaining to Renee's gun. Although he testified that she first aimed the gun at him from the car, no fingerprints were found on the gun. Padgett points to the presence of gloves in the car and argues that she might have been wearing those. The problem is that when her body was found, she was not wearing gloves. Padgett speculates that the paramedics must have removed the gloves upon attending to her in the car. Such speculation, however, lacks any support in the record.

Finally, Padgett insists that but for the amendment, his defense was completely consistent with the medical examiner's report.

This claim is misleading; evidence about the location of Renee's head wound was as undermining of Padgett's defense as the report's conclusions about the gunshot's range. Two bullets penetrated Renee's body. One entered her right chest, travelled downwards, and exited near her right armpit. The second bullet entered through the left side of the back of her head. It was this second wound that was later found to be the result of a close range firing. The position of this second wound cannot be reconciled with Padgett's testimony. He claimed to have moved to his left (Renee's right) as he fired. Unless Renee had swivelled in her seat 180 degrees, the head wound could not have been inflicted from his position. Therefore, had Padgett been able to convincingly discredit Jumbelic's conclusion about the proximity of the shot to the head, he still would have been unable to reconcile his story with the location of the wound.

Although the district court erred in denying the writ based on the independent and adequate state grounds doctrine, we believe that the writ merits denial on due process grounds. Even if a continuance had been granted and Padgett had demonstrated that Renee's head wound was not the result of a close range firing, the evidence was still more than adequate to support Padgett's conviction. The district court's judgment denying the petition is therefore

AFFIRMED.

ILANA DIAMOND ROVNER, Circuit Judge, concurring.

I agree wholeheartedly with my colleagues that when Padgett's counsel informed the trial judge that "[w]e are not prepared to move forward at this time," he was in effect requesting a continuance. *See ante* at 74. Indeed, a contrary interpretation is not only "an unduly harsh and literal reading of the exchange" (*ante* at 74), but, in my view, a frivolous one. Repeatedly, Padgett's counsel emphasized to the court that the sudden disclosure of the amended report on the day of the medical examiner's testimony had taken the defense "completely by surprise" (Padgett App. 23, 24), that the defense case

had been prepared based on the earlier version of the report (Padgett App. 23–24), and that defense attorneys had not had any opportunity to review the critical amendment with Padgett or with one another (Padgett App. 24).

Given the unexpected disclosure of the amended report at the eleventh hour, I cannot agree with my colleagues that Padgett is foreclosed from arguing that he would have sought a rebuttal expert had he been granted a continuance simply because his counsel did not request a continuance expressly *for that purpose*. *See ante* at 74–75. As the record makes entirely clear, the defense had been given the examiner's amended report only five minutes earlier and had not had even a moment to review the report and decide how to respond to it. Padgett App. 24. Indeed, when defense counsel later made the modest request for ten minutes to confer with his client about the report, he was given only five. Padgett App. 29. Under these circumstances, I do not think Padgett or his counsel can be faulted for not articulating on the spot what they might use a continuance to accomplish. The contention that he might have obtained a rebuttal expert is not at all unreasonable, and given the unexpected and belated disclosure of the medical examiner's amended report, I believe we are obligated to assume that he would have obtained such an expert.

Having said that, I ultimately am satisfied that even if Padgett had been granted a continuance in order to meet the amended report with rebuttal testimony, the jury's verdict would not have been different. *See ante* at 75. The circumstances surrounding the death of Renee Padgett, and in particular Mr. Padgett's admission from the time police first arrived at the scene that he had, in fact, shot her, confined the defense to the theory that he did so in self defense—at least, Padgett has offered no other viable theory that he might have pursued. No doubt, the evidence in the medical examiner's amended report indicating that the gunshot wound to Mrs. Padgett's head was a contact wound was important to the prosecution's successful effort to debunk the self-defense theory. Yet, as Judge Bauer has convincingly demonstrated, a great deal of other evidence undermines Padgett's account of events and indicates that the shooting was not, in reality, defensive. *Ante* at 75. I therefore agree that any prejudice stemming from the denial of a continuance did not rise to the level of a due process violation. *Ante* at 76. For that reason, I concur in the court's decision to affirm the denial of the petition for a writ of habeas corpus.