Clarence GARDNER, Petitioner–
Appellant,

v.

Paul BARNETT, Warden,
Respondent–Appellee.

No. 98–1314.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1999.

Decided May 4, 1999.

Jeff S. Pitzer (argued), Jenner & Block, Chicago, IL, for Petitioner–Appellant.

Courtney D. Carter (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Respondent–Appellee.

Before BAUER, CUDAHY and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

Joseph Waites, the student-manager of the Calumet High School football team in Chicago, was shot dead when he and other members of the football team got into a street scuffle with local gang members. A jury convicted Clarence Gardner of the first degree murder of Waites, and he was sentenced to 35 years in prison. Gardner, a self-professed gang member, was tried on a theory of accountability. At trial, the jury heard that, while Gardner neither fired the lethal shots nor supplied the gun, he punched and kicked Waites and exhorted other gang members to "bust him," a colloquialism for "shoot him." The prosecution's theory was that Gardner was the leader on the street and "gave the orders to kill." An Illinois appellate court affirmed Gardner's conviction and the Illinois Supreme Court denied his petition for leave to appeal. Gardner petitioned for a writ of habeas corpus under 28 U.S.C. § 2254. The district court denied the relief sought and Gardner now appeals, contending that his trial was rendered fundamentally unfair by the trial court's refusal (1) to grant a continuance to allow him to present his only fact witness, and (2) to thoroughly question prospective jurors about gang bias during *voir dire*. We find that the trial court acted unreasonably both in denying the continuance and in limiting *voir dire*. Because we believe that Gardner was denied his rights to due process and a fair trial, we reverse the decision of the district court and direct that the writ of habeas corpus shall issue unless the State affords Gardner a new trial within 120 days.

*Standard of Review*

A writ of habeas corpus may be issued only if the challenged decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1) or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). For the purposes of habeas review, the state court's factual findings are presumed to be correct; Gardner has the burden of rebutting the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). We review the state court's legal determinations as well as mixed questions of law and fact *de novo*. *See Long v. Krenke*, 138 F.3d 1160, 1163 (7th Cir.1998).

*Background*

The facts of this case are set out at some length in the Illinois appellate court's opinion affirming Gardner's conviction. *See People v. Gardner*, 282 Ill.App.3d 209, 217 Ill.Dec. 940, 668 N.E.2d 125 (1996). Our discussion here is limited to the facts immediately pertinent to this appeal.

On the afternoon of October 23, 1993, a few blocks from Calumet High School, several members of the high school football team were involved in an altercation with a larger group comprising members of two allied gangs, the Gangster Disciples and the Black Disciples. Among the Gangster Disciples present at the scene was the defendant, Clarence Gardner, who was sixteen years old at the time. Also present

were two older men, Richard Taylor[1] and Demitrius Smith, who had driven by in a blue car some time earlier in the afternoon. While there is some dispute over the facts—which may be explained in part by the chaos and confusion on the street that afternoon—we divine that events unfolded roughly as follows.

The incident was sparked by a series of verbal exchanges between individual football players and gang members. Gardner, who was standing in the crowd, allegedly asked the football players what they were doing and told two of them to remove their hats. During this bout of "trash-talking," Smith and Taylor pulled up to the epicenter of the altercation in the blue car. The mêlée intensified. Smith jumped out of the car and charged the football players, igniting a fullblown confrontation involving at least 50 youths. The football players fled the scene and a chase ensued. Joseph Waites—who was not a member of any gang—was grabbed by about six gang members and beaten to the ground where he was punched and kicked. In a court-reported statement given during a police interview, Gardner admitted that he participated in the beating by punching Waites three times in the chest. When the beating had ceased, Taylor appeared from the direction of the car, gun in hand, and told the others to move because he was "fixing to bust him." Another gang member, Buck Eye Lee, then said "take care of your business" and, by his own admission, Gardner said "bust him." Taylor pointed the gun at Waites and Gardner heard four shots as he ran from the scene.

Three of the football players testified at trial: Michael Waites, the victim's brother, Anthony Foster and Cantrell Davis. Each testified that he knew Gardner at the time

and that Gardner went by the nickname "Ceno." Michael Waites testified that when the blue car pulled up to the epicenter of the altercation, Gardner said "bust them folks" and that he repeated the words "bust him" three times more. Anthony Foster testified that after the driver and passenger got out of the car, Gardner told them that the football players were members of a rival gang and said "bust at their ass." Cantrell Davis confirmed the gist of Foster's testimony but testified that he heard Gardner say "fuck that folks shoot them, pop at them, bust at them, bust at them." However, on cross examination, Davis conceded that the speaker was outside his line of vision and that his identification of Gardner was based on voice recognition alone. Although Michael Waites, Anthony Foster and Cantrell Davis each spoke to the police on the day of the shooting, none of the three attributed the "bust" statements to Gardner at that time; it was only in subsequent police interviews that Gardner was named. In fact, on the day of the shooting each of the three stated that they believed the speaker to have been a Black Disciple, whereas at trial they testified that they had known that Gardner was a Gangster Disciple.

In his court-reported statement, Gardner admitted that he said "bust him" in the final stage of the altercation before Taylor fired the fatal shots. Whether these words were a leader's orders into action or the mere echoing cry of a foot soldier after the evil deed was virtually done was a defining issue at trial. The prosecution's case—that Gardner was "the chief" on the street—depended heavily on its characterization of Gardner's role during the initial stages of the altercation.[2] The contention

---

1. In a court-reported statement given during a police interview, Gardner referred to Richard Taylor by another name, Tony Davis.

2. The defense's theory was that there were two distinct phases to the altercation: the first phase comprised the initial confrontation and subsequent flight of the football players; the second phase involved the beating and

ultimate shooting of Waites. The defense argued that because Michael Waites, Anthony Foster and Cantrell Davis fled the scene during the first phase, they were not privy to what was said and done during the second phase. The prosecution depicted the altercation as a single, shorter episode and relied on the testimony of these witnesses that only a

that Gardner issued an order to kill rested in part on the notion that Gardner had been the one issuing orders during those initial stages. The defense, of course, attempted to cast Gardner as a hapless private in the ranks. It argued that precisely because Gardner had *not* been the guy in charge during the initial stages, his utterance of the words "bust him" in the final stage was not a leader's order to kill but merely an excited exclamation—an echo of the shooter's own words—albeit of a less than innocent bystander.

### Continuance

The trial commenced on Wednesday, February 15, 1995. During *voir dire*, the trial judge advised prospective jurors that the trial might stretch over to the following Tuesday, February 21. The prosecution rested its case in the middle of the afternoon on Friday, February 17. The defense then presented one impeachment witness, a police officer who had taken statements from the prosecution's eyewitnesses. Gardner did not testify in his own defense. At about 3:30 p.m., the defense informed the trial judge that it had one more witness, Luther Donald, a friend of the victim, who had promised to be in court that day but had gone to school instead. The defense moved for a continuance to the next court day—Tuesday, February 21, since Monday was a court holiday—in order to allow Donald to testify. When questioned about the content of Donald's proposed testimony, the defense explained:

> We expect him to say that he was present with other football players and that he saw this car come up with two people in it. And that he heard the words at that point bust him or shoot him. That it came from one of the people in the car neither of whom were seen. When he first talked to the police he did give

them the name Ceno. He did not assign to that person those statements.

Tr. at 145. In other words, Donald would have testified that he heard someone in the car—presumably Smith and Taylor (and not Gardner who was never in the car)—say "bust him" at the moment when Michael Waites, Anthony Foster and Cantrell Davis allegedly heard Gardner utter those very words. In denying the request for a continuance, the trial judge stated:

> Let the record reflect that it is now 3:35. It appears to me on Friday—Monday is a court holiday. Tuesday we are 4 judges short. We have five jury trials, 2 judges to do it, myself and Judge Erickson. That's what is scheduled for Tuesday. It seems to me that this witness's testimony is cumulative with everything else you have said he will say, including that somebody in the car said bust him. One of the witnesses—all the witnesses have said this person got out of the car, said he wanted to bust him or something to that effect. It's already been said. And it's also opinion. It's also in the defendant's statement. It seems to me leaving aside the fact I think given the current posture of the case, if it was just for one day tomorrow, that wouldn't be so bad. I don't want the jury out on this case for three days and coming in on the 4th especially in view of the Court's schedule and in view of the fact that this is cumulative.

Tr. at 145–46. Gardner contends that the trial court committed constitutional error. He argues that the denial of his request for a continuance violated his Sixth Amendment right to present a defense and his Fourteenth Amendment rights to due process and a fair trial.

■ The right of a defendant to present witnesses is "the right to present a defense" and therefore "a fundamental ele-

---

matter of seconds elapsed between the football players' flight and the firing of the fatal shots. For present purposes, it is not necessary to choose one of these versions over the other. It is sufficient to note that, whatever

its overall duration, the altercation comprised several discernible stages—the precipitous verbal exchanges, the assault on the football players, the flight and chase, the beating of Waites and, ultimately, the fatal shooting.

ment of due process of law." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *see also Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). However, the right is not absolute and must be balanced against other legitimate interests in the criminal trial process. *See McMorris v. Israel*, 643 F.2d 458, 460–61 (7th Cir.1981). Whether to grant a continuance traditionally lies within the discretion of the trial judge. *See Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *United States, ex rel. Searcy v. Greer*, 768 F.2d 906, 912–13 (7th Cir.1985).

 When the request for a continuance is based on the unavailability of a witness, we have premised our review on four factors: "(1) whether due diligence has been exercised to obtain the attendance of the witnesses; (2) whether substantial favorable evidence would be tendered by the witness; (3) whether the witness is available and willing to testify; and (4) whether the denial of the continuance would materially prejudice the defendant." *Searcy*, 768 F.2d at 913. At the same time, the Supreme Court has cautioned: "There are no mechanical tests for determining when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar*, 376 U.S. at 589, 84 S.Ct. 841. Our task then is to weigh the exculpatory significance of Donald's testimony against the competing state interests that prevented Gardner from presenting this evidence at trial. *See McMorris*, 643 F.2d at 461. Gardner has the burden of demonstrating that the denial was fundamentally unfair and that "the resulting prejudice [is] such that had the continuance been granted, there is a reasonable probability that the verdict would have been different." *Padgett v. O'Sullivan*, 65 F.3d 72, 75 (7th Cir.1995).

██ The trial court gave two reasons for denying the continuance: the court's schedule and the cumulative nature of the proposed testimony. As between the two, the trial court seemed particularly preoccupied with the organization of its calendar. It is undisputed that the continuance would have necessitated stretching the trial over to the next court day. But according to defense estimates, Donald's testimony would have taken no more than one and a half hours of trial time. It is likely, therefore, that the completion of the trial would have required at most a further half day of the court's time. While the administration of the criminal docket is obviously important and is a major responsibility of the trial court, we think here that it is an inadequate justification for denying a reasonable request for a short continuance to present the *only* defense occurrence witness. In this instance, the potential prejudice to Gardner's defense was immeasurable and clearly outweighed what was at worst a modest disturbance of the court's calendar. In short, the trial court demonstrated "myopic insistence upon expeditiousness in the face of a justifiable request for delay...." *Ungar*, 376 U.S. at 589, 84 S.Ct. 841. Evidently our view is shared by the Illinois appellate court which expressed its "uneasiness with the trial court's excessive concern about the next week's schedule in the criminal court." 217 Ill.Dec. 940, 668 N.E.2d at 130.

The trial court's second rationale for the denial—that Donald's testimony was cumulative—goes to the heart of this appeal. The Illinois appellate court recognized that Donald's testimony "while cumulative to some degree, would have been of use to the defense." 217 Ill.Dec. 940, 668 N.E.2d at 130. But, ultimately, the appellate court could not say that the proposed testimony was material or that its absence prejudiced Gardner's right to a fair trial. We agree that Donald would have helped Gardner's cause at trial and we are strongly impressed by the importance of his evidence. Our reading of the record suggests

that Donald's testimony could have been more than beneficial; insofar as it substantiated Gardner's version of events—and challenged the prosecution's theory of the case—Donald's testimony could have proved decisive. *See Searcy,* 768 F.2d at 913.

Three distinct references to the use of the term "bust him" were introduced into evidence at trial: (1) the prosecution's eyewitness testimony that Gardner spoke the phrase during the initial stages of the altercation; (2) Taylor's direction to other gang members to move out of the way because he was "fixing to bust him;" and (3) Gardner's admission in his court-reported statement that he had said "bust him" in the final stage of the altercation. Donald would have testified that when the blue car pulled up to the epicenter of the altercation he heard the words "bust him" come from someone *in the car.* Gardner, of course, was not in the car. Thus, Donald would have testified about a fourth distinct statement clearly attributable to someone other than Gardner during the initial stages of the altercation.

Since the football players fled the scene before the shooting, the defense maintains that the testimony of Michael Waites, Anthony Foster and Cantrell Davis—that they heard Gardner say "bust him" or words to similar effect—relates only to those initial stages. Donald would also have addressed what was said during that time and, in so doing, he would have challenged their version of events. In particular, he would have contradicted their testimony that it was Gardner who said "bust him" when the car pulled up. In constructing Gardner's alleged leadership role, the prosecution placed great store on its eyewitness testimony. Donald's ability to contradict that version of events was particularly significant because of the inconsistencies (noted above) between the original police statements and the trial testimony of Michael Waites, Anthony Foster and Cantrell Davis. At the very least, Donald's testimony would have cast a shadow of doubt over their identification of Gardner as the speaker.

We have noted that the prosecution's theory of the case relied heavily on Gardner's alleged leadership role during the initial stages of the altercation. By imputing the statement "bust him" to someone other than Gardner within that window of time, Donald would have undermined the prosecution's theory that Gardner was the "chief," *the* Disciple calling the shots on the street that afternoon.[3] Specifically, Donald would have pointed the finger at Smith and Taylor, two older men, who had a direct hand in the death of Waites. Smith drove the car, supplied the gun and instigated the physical assault; Taylor declared that he was "fixing to bust" Waites and fired the fatal shots. Indeed, it was the arrival of these men at the scene that signaled the transformation of an episode of "trash-talking" into a violent assault and killing. In the circumstances, it is entirely plausible that Smith and/or Taylor—rather than Gardner—were orchestrating events and giving orders. Donald's testimony would have substantiated that view. Moreover, by deconstructing Gardner's alleged leadership role, Donald would have implicitly bolstered the defense's claim that Gardner's "bust him" in the final stage of the altercation was not a leader's order but instead a foot soldier's exclamation in the heat of battle.[4]

---

3. The prosecution reached the culmination of its leadership theory on rebuttal in closing argument: "A man by the name of Hitler never murdered anybody, never touched anybody, never placed anybody inside of one of those ovens but yet he was the one that set this into motion. He's the one that gave that order.... That's what this case is about today." Tr. at 176.

4. The dissent proceeds on the assumption that the statement must have been an order to kill. We believe instead that an understanding of the broader context is required. Here, the shooter strode up to the victim, gun in hand, saying that he was "fixing to bust him." Buck Eye Lee, another gang member, told the shooter to "take care of his business." Gardner then echoed the shooter's words and ran

We fail to see how Donald's testimony could be regarded as cumulative. Donald would have provided important evidence, new to the trial, that never reached the jury. Insofar as it would have raised questions about the timing of the so-called "orders to kill" as well as the identity of the speaker it would have been both fresh and material (certainly not cumulative). To the extent that Donald would have shed light on who said what and, particularly, when, we believe that his testimony was material to the jury's determination of the defining issue whether Gardner was leader or foot soldier—whether his was a "voice" or merely an echo.[5]

Whether the prosecution's evidence was "still more than adequate" to support Gardner's conviction—notwithstanding anything Donald might have said—is sharply disputed. *Padgett,* 65 F.3d at 75. During oral argument, the State described as "inconceivable" the notion that Gardner would have been acquitted on the basis of Donald's testimony. But we do not share the State's confidence in the strength of its evidence. Donald was Gardner's only fact witness and, as a friend of the victim, his testimony could have carried particular

weight with the jury. We are not saying—nor is it necessary to say—that the jury would have been swayed by the defense at the end of the day. We are saying that the defense was entitled to tell its story and that Donald was an essential character in that tale. To put it another way, the jury was entitled to consider the evidence regardless of whether ultimately it might have chosen to accept or reject it. *See Enoch,* 768 F.2d at 163. The bottom line: this was a close case and Donald's testimony may well have been enough to create at least a reasonable doubt in the mind of the jury.

The State argues that, in any event, Donald's testimony was not essential since Gardner could have been convicted for murder on an accountability theory as a mere accomplice. The Illinois appellate court was persuaded by this argument. *See* 217 Ill.Dec. 940, 668 N.E.2d at 130. But while we defer to the appellate court's explanation of Illinois's accountability theory, we take the view that what the prosecution *could* have argued on another day is beside the point. The prosecution here went to trial on the theory that Gardner

---

away. At trial, perhaps conscious that this exchange is certainly open to more than one interpretation, the prosecution reached back to the *initial* stages of the altercation (with regard to which its witnesses, Michael Waites, Anthony Foster and Cantrell Davis testified) in an attempt to cast Gardner as the leader from the start, issuing orders. For if Gardner was not the leader, his statement cannot be characterized as an order. And if Gardner's statement was not an order, but a mere echo of the shooter's own words, the prosecution's theory collapses. Insofar as Donald's testimony would have challenged Gardner's leadership role, it could have triggered a domino effect. Without the benefit of this evidence, we believe that the jury was presented with a very one-sided depiction of events.

5. The present case is analogous to *United States, ex rel. Enoch v. Hartigan,* 768 F.2d 161 (7th Cir.1985), insofar as the putative testimony provides a window on the time frame of events. The defendants there were three brothers accused of raping and sexually assaulting Sandra Davis in their apartment. The defense sought a continuance to present an additional witness, Patricia Griffin, who

lived next door to the Enoch brothers. Griffin was expected to testify that she had heard no struggle in the Enoch apartment on the night in question and that the following morning she had heard a man other than one of the Enochs yell at Davis: "Bitch, where's the money?" suggesting that Davis may have engaged in an act of prostitution and found herself in trouble with her pimp. The trial court took the view that Griffin's testimony would have been cumulative since others had testified that Davis was a prostitute. However, we disagreed, on the ground that Griffin's testimony would have gone to the issue whether Davis had engaged in an act of prostitution *on the night in question.* As such it would have provided an alternative explanation to the prosecution's theory of the case. *See id.* at 162–64. Similarly, in the present case, Donald's testimony would have provided a different perspective on the first phase of the altercation, when, according to the prosecution, Gardner allegedly said "bust him" and thereby set in motion the events leading to Waites's death.

was the leader who issued the order to kill; the jury was not asked to convict Gardner for merely emboldening Taylor in the shooting of Waites.

■ Finally, the State argues that defense counsel was less than diligent in securing the appearance of Donald in court and points out that there was no evidence that Donald would have been available and willing to testify on the next court day. But in giving his reasons for refusing the continuance, the trial judge cited neither a lack of diligence on the part of defense counsel nor a concern over Donald's availability and willingness to testify. The State concedes that the absence of a subpoena in the record does not in itself justify the denial of a continuance, but argues, nonetheless, that this deficiency demonstrates a lack of diligence.[6] While the defense may be faulted for not securing a subpoena, we do not consider this a fatal oversight. And we see no firm basis for believing that Donald would not appear on the next court day.

For all of these reasons, we believe that the trial court constitutionally erred in refusing to grant Gardner's request for a continuance and that he is therefore entitled to a writ of habeas corpus.

*Voir Dire*

■ The Sixth Amendment right to an impartial jury guarantees an adequate *voir dire* to identify unqualified jurors and to provide sufficient information to enable the defense to raise peremptory challenges. *See Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *Rosales–Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 68

L.Ed.2d 22 (1981); *United States v. Lewin*, 467 F.2d 1132 (7th Cir.1972). The Constitution "does not dictate a catechism for *voir dire*," *Morgan*, 504 U.S. at 729, 112 S.Ct. 2222, and there is no right to have particular questions asked. *See Ham v. South Carolina*, 409 U.S. 524, 528–29, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). Provided that the minimum mandates of the Sixth Amendment are satisfied, the trial court has broad discretion in determining what questions may be asked. *See United States v. McAnderson*, 914 F.2d 934, 942–43 (7th Cir.1990).

■ In the present case, Gardner contends that the trial court abused its discretion by refusing to allow sufficient questioning to uncover potential gang bias. Having unsuccessfully moved to exclude all gang-evidence from the case, the defense submitted five questions—designed to elicit gang bias—for the court to pose to potential jurors during *voir dire*:

(1) Have you or any member of your immediate family ever had any direct involvement with a street gang?

(2) Do you think that someone who is in a gang is necessarily a criminal?

(3) Do you understand that it is not a crime just to join a gang?

(4) Do you understand that one member of a gang is not legally responsible for the actions of other gang members just because they are in the same gang?

(5) Would you be able to put aside any feelings you may have about gangs, and give the defendant a fair trial based on the evidence?

---

6. The State has not cited—nor can we find—any direct support for its position. Illinois case law suggests that the issuance of a subpoena is relevant but not decisive. *See People v. Timms*, 59 Ill.App.3d 129, 17 Ill.Dec. 37, 375 N.E.2d 1321, 1325 (1978) (failure to subpoena witnesses did not in itself establish a lack of due diligence where counsel reasonably expected witnesses to come in on their own and witnesses were delayed by unrelated last-minute events); *People v. Thomas*, 4 Ill.

App.3d 535, 281 N.E.2d 447, 448 (1972) (denial of a continuance upheld where counsel had not subpoenaed the witness but also failed to show the materiality of the proposed testimony). *See also People v. Sargent*, 184 Ill.App.3d 1016, 133 Ill.Dec. 115, 540 N.E.2d 981, 985–86 (1989) (counsel's failure to indicate the content of the proposed testimony and to explain the whereabouts of the witness demonstrated a lack of diligence).

The trial court agreed to pose the first question and offered to follow-up if any of the prospective jurors responded in the affirmative. Moreover, during the course of *voir dire*, the court asked about any indirect involvement that the jurors or any family members might have had with street gangs. The trial court refused to pose the remaining questions, however, or to allow the defense to pose them in its stead.

The conduct of *voir dire* in gang cases presents particular challenges. Our society takes a very dim and undiscriminating view of street gangs. That jurors may automatically see in gang membership the taint of criminality is a real concern. The Illinois courts have recognized that evidence of gang association may have an unduly suggestive and distorting effect on a jury. *See People v. Cruz*, 164 Ill.App.3d 802, 115 Ill.Dec. 795, 518 N.E.2d 320, 327 (1987) ("... in Chicago, as in every other large metropolitan area, 'there is a deep, bitter and widespread prejudice against street gangs.'") (quoting *People v. Parrott*, 40 Ill.App.3d 328, 352 N.E.2d 299, 302 (1976)). Moreover, an Illinois appellate court has held that a trial court's failure during *voir dire* to ask any questions that would probe for gang bias amounts to reversible error. *See People v. Jimenez*, 284 Ill.App.3d 908, 220 Ill.Dec. 97, 672 N.E.2d 914, 917 (1996).

We have previously recognized the importance of thorough *voir dire* in the context of gang trials. In *McAnderson*, the defendants were muslims and members of the El Rukns, a predominantly black Chicago street gang, who were convicted of involvement in a conspiracy to commit terrorist acts. The defendants challenged the adequacy of *voir dire*, contending that the district court should have asked more pointed questions in probing for racial and religious bias (rather than gang bias specifically). We refused to reverse what we deemed to be a careful and detailed *voir dire* process, noting that the district court had asked questions not only about the defendants' race, religion and ethnic background but also about the jurors' knowledge of the El Rukns. *See* 914 F.2d at 943.

In the present case, the persona of the street gang ran like a thread through the fabric of the trial. From the first sally of opening argument, through the various stages of the trial, the prosecution emphasized the case's immersion in gang lore. The jury was told about Gardner's membership in the Gangster Disciples, his association with other gang members on the day of the shooting, the provocative "trash-talking" of the gang members, the gang-motivated confrontation with the football players, and ultimately, the gang-beating and gang-shooting of Waites. The prosecution hammered the theme home in rebuttal argument on closing:

> This case is about the stupidity of street gangs in Chicago. You have seen first hand why this country looks at Chicago with such disgust and disdain. It's because of GDs, because of folks just like this seated right here.
>
> Some people have asked what can we do about this senseless violence, about these innocent victims that will die. There was an innocent victim in this case. He did nothing, nothing, nothing deserving to die. My God, we have to do something about that. Well today as jurors you have the rare privilege of being in a position to actually do something about the gang violence in Chicago.

Tr. at 181. Given the prosecution's emphasis on gangs as central to the case and the powerful bias against membership in gangs, identifying gang bias among prospective jurors was essential to an adequate *voir dire*—all the more so since Gardner was to be tried on an accountability theory. The prospective jurors were asked only whether they or any member of their immediate family had ever had any involvement—direct or indirect—with street gangs. This strikes us as an unduly narrow approach. The potential for juror

bias is by no means limited to direct or indirect involvement with street gangs. Like any other form of prejudice, gang bias may be born of perception as much as personal experience. Most potential jurors in Illinois (and their families) may have had no direct or indirect involvement with street gangs but many of them would probably hold opinions on the subject. In the circumstances, we believe that some questions directed to juror perception of and predisposition towards gangs would have been appropriate. An adequate inquiry should include (but need not be limited to) questions that confirm the ability of prospective jurors to put aside any such feelings and decide the case on the basis of the evidence presented.

We recognize that the trial court need not recite a litany of questions during *voir dire*—including the particular questions requested by the defense. But the court should undertake some minimal inquiry into matters that may have a bearing on bias. Thus, we cannot share the view of the Illinois appellate court that the questions posed by the trial court here were sufficient to create a reasonable guarantee that any bias would be discovered. *See* 217 Ill.Dec. 940, 668 N.E.2d at 131. And given the narrowness of the trial court's inquiry, the offer of follow-up on any positive response was essentially meaningless. This was not an instance where the trial court undertook "a lengthy and detailed" *voir dire* in probing for gang prejudice and merely refrained from asking "certain questions thought by the defense to be better than the ones used." *McAnderson*, 914 F.2d at 943 (internal

quotation and citation omitted).[7] Clearly something more was required here in order to meet "the essential demands of fairness." *Morgan*, 504 U.S. at 730, 112 S.Ct. 2222. In the circumstances, we believe that the trial court's questioning was insufficient to assure Gardner the adequate *voir dire* to which he is constitutionally entitled.[8]

We find that the trial court's decisions to deny the continuance and to limit *voir dire* were "contrary to, or involved an unreasonable application of, clearly established Federal law...." 28 U.S.C. § 2254(d)(1). Thus, we REVERSE the decision of the district court and REMAND with the direction that the writ of habeas corpus shall issue unless the State affords Gardner a new trial within 120 days.

BAUER, Circuit Judge, dissenting.

I respectfully dissent. I start with two givens: the district court opinion is to be affirmed unless it is unreasonable and both the district court and this court must review the factual findings of the state appellate court presuming them to be true. Add another fact: the defendant confessed to the event that led to his conviction—and *that* fact remains fixed. The confession's admissibility was based on a factual finding, untouchable for practical purposes, by any but the trial court.

The proposed testimony of the missing witness (or more accurately, the unsubpoenaed witness), taken at best, would not have been a "radically" (appellant's term) different story than that presented by the

---

7. The present case is also distinguishable from *United States v. Granados*, 117 F.3d 1089, 1092–93 (8th Cir.1997), in which the Eighth Circuit upheld the adequacy of a *voir dire* where the defense had raised no objection to the district court's failure to put questions relating to gang bias to the prospective jurors.

8. The dissent implies that inquiry into gang prejudice must necessarily be long and tortuous. But there is no prescribed formula for *voir dire*. The number and nature of questions posed and the extent of any follow-up are within the discretion of the trial judge provided the constitutional yardstick of adequacy is met. We part company with the dissent on the recipe for an adequate *voir dire* in gang trials. We simply cannot see how an inquiry directed solely to the jurors' involvement with gangs can be adequate in these circumstances. Something more is required to facilitate the exercise of peremptory challenges and, ultimately, to guarantee an impartial jury.

 

prosecution. What he would have said, according to the attorney who requested the continuance, was that he heard one of the people in the car say "bust him or shoot" him. Even if true, this does little to help the defense; more than one person might use the language ascribed to the defendant. As the appellate court carefully pointed out, Gardner "admitted saying 'bust him' meaning 'shoot him'. Tony shot him." And witnesses testified that Gardner used the phrase four times. That satisfies my comfort level that justice was done.

As Justice Wolfson said in his excellent opinion: "Whether Gardner said it once (as he admitted) or four times (as eyewitnesses testified), 'bust him' is a directive to shoot. We cannot see that Donald's testimony about the initial 'bust him' would have made any difference." (*People v. Gardner*, 282 Ill.App.3d 209, 217 Ill.Dec. 940, 668 N.E.2d 125, at 130).

I also hold the firm belief that the street gang matter was appropriately handled by both the state courts and federal district court. The subject matter is delicate; long inquiries can be more detrimental to a fair trial than serve to expose an unwarranted prejudice. Street gangs have gained a deserved reputation for murder, terror and general criminal activity. To ask a juror about any prejudice he or she might harbor about a gang member or gang activity is to invite a trip through mine fields. Such a trip requires balance that I believe was given in this case. The Illinois appellate court handled this issue in a most appropriate fashion.

Because I think the appellant has failed to rebut the presumption of correctness of the Illinois courts, I would affirm the denial of the writ.[1]

---

1. Footnote 4 of the opinion says that the dissent proceeds "on the assumption that the statement must have been an order to kill". Indeed it does. The transcript shows that Gardner confessed that he said "bust him" immediately prior to the murder. When asked what he meant by saying "bust him", Gardner replied "shoot him". And when asked what happened next, Gardner said "that fellow gang member Tony Davis walked up to him and pointed the gun to [Joe Waites's] face." Then came the shots. I suggest that satisfies the question of who gave the order to shoot.

And if no one here is aware of who was in charge, the shooter was. He did what Gardner told him to do. He killed on command.