THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRANCE STRAIN, Defendant-Appellant.

First District (1st Division)   No. 1—97—3585

Opinion filed June 28, 1999.

Michael J. Pelletier and Christopher W. Buckley, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GALLAGHER delivered the opinion of the court:

Terrance Strain (defendant) was charged with two counts of first degree murder in the shooting death of Geary Dow, a former Marine and Chicago Transit Authority employee. Following a jury trial, defen-

dant was convicted on both counts and sentenced to 45 years in the Illinois Department of Corrections. Defendant is now appealing this conviction. We reverse and remand for a new trial.

The evidence at trial showed the following. The State's witness, Terry Bosley, testified that he and his friend Geary Dow were doing electrical work on a house near the intersection of 120th and Perry in Chicago beginning at about 5 p.m. on February 12, 1996. After they began working, however, they realized that they needed a different type of wire to finish the job. Before leaving at around 9:45 p.m., they told the homeowner that they would return to finish the job the following day at about 10 or 11 a.m.

The homeowner offered to have her daughter drive them back home in her van, which was parked on the street in front of the house. Bosley and Dow stepped outside by the passenger side of the van to wait for the daughter and heard gunshots. Since the noise came from far away, the men did not take cover or return to the house. While Bosley and Dow were talking to each other, they saw three men coming toward them from the intersection. The three men did not speak as they walked past Bosley and Dow, who had continued their conversation.

Seconds later, Bosley heard more gunshots and looked over to find two of the men near a stop sign at the intersection. One of the men was firing a gun in their direction. Bosley dove in front of the van while Dow moved toward the back. Bosley heard at least three or four more shots before the gunfire stopped. He saw the two men run from the intersection, with one of the men limping. Dow had been shot in the head and was bleeding. Bosley began calling out for help until people arrived. At the hospital later that night, Bosley learned that Dow had died of the gunshot wound.

Two other witnesses for the State, James and Darryl Burnett, testified that they were present when the shooting took place. They lived with their mother near the intersection of 120th and Perry. James was a "governor" in the Gangster Disciples street gang. He testified that the Gangster Disciples and the Black Disciples were at war. Perry Avenue, according to James, was a neutral zone, but west of Perry was controlled by the Gangster Disciples and east of Perry was Black Disciple territory. James testified that the war was over drugs and territory, in particular, with the Black Disciples encroaching on Gangster Disciple territory. James also testified that he had known defendant for eight to nine years and that they got along despite defendant's Black Disciple membership.

At the time of the shooting, James said he was standing in front of his house with Darryl and some friends at about 9:45 p.m. He heard

gunshots about a block away. The street was well lit and James had no problems seeing down the street. Next he saw a group of about five or six men run down 120th Street. He recognized defendant and another man on a corner at the intersection of 120th and Perry. He also saw two men and a woman who had come out of a nearby house and walked to a van parked on the street.

After hearing the gunfire, James ran to the front porch of his house. From this vantage point, he saw defendant back up into the middle of the street from the corner and shoot 12 to 15 times in the direction of the woman and the two men. One of the men was hit with shots fired from defendant's 9 millimeter handgun. Defendant turned and ran toward the intersection of 119th and Lafayette and went through a vacant lot. James noticed defendant was running with a limp.

Darryl, also a Gangster Disciples member, testified that he was standing with James and a friend in front of their house at about 9:45 p.m. Shortly thereafter, he heard shots coming from the intersection of 120th and Perry and then ran onto the front porch and into the house. From inside the house, Darryl heard more shots. He did not see the shooting outside.

Both James and Darryl testified that defendant had been involved in an earlier shooting near the same intersection on February 6, 1996. On that day at around 12 p.m., Darryl and a friend drove past defendant who was standing in front of a house near the intersection. Darryl, who had known defendant from the neighborhood said "What's up" as he drove past. Defendant opened fire on the car after it had passed through the intersection and then fled through a vacant lot across the street. James was in the front of his house working on his car. He saw defendant fire on the car. James testified that defendant used a 9 millimeter handgun and had a crutch. James and Darryl reported the shooting incident to the police later that afternoon.

James testified that there was a war between the Gangster Disciples and the Black Disciples in February 1996 and that the intersection was on a boundary line between the two gangs' territories. He testified that defendant had been a member of the Black Disciples for several years. James testified that defendant had been shot in the left leg on the street in January 1996.

James further testified that he had seen defendant in the back of a police car on February 9, 1996, when the police raided the house of a Gangster Disciple who lived near the intersection. Around this time, the police raided several other houses owned by Gangster Disciples. Darryl also saw defendant in the back of the police car and suspected him of being an informant for the police.

A Chicago police detective testified that, after defendant was apprehended, he gave two separate statements. First, he spoke at 11 p.m. on February 21 and again at about 3 a.m. on February 22. However, defendant refused to make or sign a written statement. The detective said that the content of both statements was the same except for a few small details. An assistant State's Attorney was present for defendant's second statement.

In his statements, defendant revealed that he was a member of the Black Disciples, that there was a war between the Black Disciples and Gangster Disciples, that the Gangster Disciples had shot him earlier, and that he had been acting as an informant for the police.

He stated that on the night of February 12, he was with Allen Higgenbottom at another friend's house near 119th and Lafayette when the backyard lights, which were equipped with motion detectors, went on. Defendant knew that Gangster Disciples had been "creeping" across the border to take random shots at Black Disciples. Defendant and Higgenbottom armed themselves with 9 millimeter handguns and went through a gangway to the intersection of 120th and Perry, where they saw a group of Gangster Disciples and a man standing by a van at the side of the street. Defendant heard a cry of "buck, buck, buck," which meant "kill the niggers," and then a shot. Defendant saw Higgenbottom fire his gun once and then run back to the gangway. Defendant began firing in the direction of the Gangster Disciples and the man by the van. He also retreated to the gangway after firing nine shots. Higgenbottom told defendant he fired only one shot because his gun had jammed. Defendant threw away the gun he used into a nearby garbage can.

At trial, defendant testified in his own defense. Defendant admitted that he had been a member of the Black Disciples since he was 12 years old. He said he had left the gang around the end of 1994 and beginning of 1995. He also testified that he was at his sister's apartment on the night of Dow's shooting and denied being at 120th and Perry or with Higgenbottom. Melinda Smith, defendant's sister, confirmed that he was at her apartment on February 12.

Defendant testified that a group of Gangster Disciples shot him in the arm and leg on January 29, 1996. He was taken to the hospital and gave the police the street names of the shooters. After he was released from the hospital, defendant required crutches and went to live with his sister in her apartment. He denied shooting at a car at the intersection on February 6, stating that on that date he went to Olive Harvey Junior College to pick up his homework so that he would not fall behind.

After he was shot in January of 1996, defendant gave the police

information that led to a number of raids, including the February 9 raid across the street from James and Darryl Burnett's house. Defendant had served as an informant for the police for about a year and had supplied the information that caused the police to raid the Burnett house in March 1995.

On February 20, 1996, defendant learned that the police were looking for him in connection with the Dow shooting, so he paged an officer he knew to arrange for a meeting. He flagged down a police car and voluntarily went to the police station. Defendant testified that, at the station, he told inquiring officers that he had nothing to say and wanted a lawyer. He denied making any statements regarding the shooting to the detectives or the assistant State's Attorney at the police station. Defendant denied both the shooting at a car on February 6 and shooting Dow next to the van on February 12.

Defendant contends on appeal: (1) the trial court's refusal to allow additional *voir dire* questions on prejudice against gangs denied defendant an impartial jury and a fair trial; (2) defendant failed to receive effective assistance of counsel where Burnett's hearsay testimony regarding her son James' statements was admissible for a limited purpose only, but defense counsel did not object to prejudicial content in the testimony, did not request a limiting instruction from the trial court, and did not object to the prosecutor's remarks in closing argument construing the testimony as evidence of James' prior consistent statements and defendant's guilt; (3) one of defendant's two convictions for first degree murder should be vacated and the mittimus corrected where defendant committed only one murder; (4) defendant should not be subject to the Illinois truth-in-sentencing law which violated the single subject rule of article IV, section 8, of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8); and (5) defendant's mittimus should be amended to reflect 548 days' credit for time served. We reverse and remand for a new trial.

First, defendant contends that the trial court erred when it failed to inquire during *voir dire* if the venire members would be prejudiced by knowledge of defendant's membership in a gang. Thus, defendant argues that the trial court's *voir dire* examination was insufficient, precluding him from receiving a fair and impartial trial.

In this case, the court began its questioning on the issue of gang membership:

> "Ladies and gentlemen, I expect during the course of the trial, there will be evidence of gang membership. Various individuals involved in the trial."

During the court's colloquy with each venireman, it asked:

> "Has any member of your immediate family or very close friend ever been involved in a gang?

* * *

Can you be fair to both sides here?"

After the first 20 veniremen had answered the court's questions, defendant wanted the court to ask the same prospective jurors two more questions:

"1. If you learned the defendant is a member of a gang, would this make him less believable[?]

2. If you learned the defendant is and was a member of a gang would it make it more likely than not that he's guilty of a gang shooting[?]"

However, the trial court refused to pose these questions or to allow the defense to pose them in its stead. The court offered instead to follow up if any prospective jurors responded in the affirmative to its question on gangs.

Initially, the State argues defendant waived his ability to contest *voir dire* because of the lateness of his request to ask each juror additional questions regarding gangs. In denying defense counsel's request to ask two questions specifically concerning gang bias, the trial court stated that these questions were not supplemental but completely new and, therefore, not allowed under Supreme Court Rule 431 (134 Ill. 2d R. 431) and courtroom procedure. However, while defense counsel failed to adhere to the trial court's specified procedure for submitting questions to the venire, something more was required during *voir dire* in order to meet "the essential demands of fairness." See *Morgan v. Illinois*, 504 U.S. 719, 730, 119 L. Ed. 492, 503, 112 S. Ct. 2222, 2230 (1992). Courtroom procedure should not prevent the court from preserving a constitutional right of the defendant. See *People v. Jimenez*, 284 Ill. App. 3d 908, 912, 672 N.E.2d 914, 917 (1996) ("even a gang member has a constitutional right to have his case determined on the basis of the evidence of his guilt or innocence, by a jury that is not predisposed to find him guilty solely because of his gang membership"). Therefore, we will consider defendant's arguments concerning *voir dire* in this case.

■ The sixth amendment right to an impartial jury guarantees an adequate *voir dire* designed to identify unqualified jurors and ensure the selection of an impartial jury. *People v. Lanter*, 230 Ill. App. 3d 72, 75, 595 N.E.2d 210, 213 (1992). "The Constitution 'does not dictate a catechism for *voir dire*' [citation], and there is no right to have particular questions asked." *Gardner v. Barnett*, 175 F.3d 580, 588 (7th Cir. 1999). Providing the minimum mandates of the sixth amendment are satisfied, the trial court has broad discretion in determining what questions may be asked based on the necessities of each case. *United States v. McAnderson*, 914 F.2d 934, 942-43 (7th Cir. 1990). In fact, in

most cases, the scope of *voir dire* is best left to the sound discretion of the trial judge. *People v. Lobb*, 17 Ill. 2d 287, 300, 161 N.E.2d 331, 332 (1959); see 107 Ill. 2d R. 234. However, limitation of *voir dire* questioning may constitute reversible error if it results in denying a party a fair opportunity to properly investigate an important area of potential bias and or prejudice among prospective jurors. *People v. Oliver*, 265 Ill. App. 3d 543, 548, 637 N.E.2d 1176, 1177 (1994).

■ To successfully challenge the adequacy of *voir dire*, it is not necessary for the defendant to show that the jury was, in fact, prejudiced. *Lanter*, 230 Ill. App. 3d at 75, 595 N.E.2d at 213. Instead, the standard for determining whether the trial court abused its discretion is whether the means employed to test juror impartiality have "created a reasonable assurance that prejudice would be discovered if present." *Lanter*, 230 Ill. App. 3d at 75, 595 N.E.2d at 213. Trial courts must exercise discretion so they do not "block the reasonable exploration of germane factors that might expose a basis for challenge, whether for cause or peremptory." *United States v. Lewin*, 467 F.2d 1132, 1138 (7th Cir. 1972). The examination must adequately "call to the attention of the veniremen those important matters that might lead them to recognize or to display their disqualifying attributes." *Lewin*, 467 F.2d at 1138.

Conducting *voir dire* in gang cases presents particular challenges since gang membership is an area of potential bias. *Jimenez*, 284 Ill. App. 3d at 912, 672 N.E.2d at 917; see *People v. Cruz*, 164 Ill. App. 3d 802, 812, 518 N.E.2d 320, 327 (1987) ("in Chicago, as in every other large metropolitan area, 'there is a deep, bitter and widespread prejudice against street gangs' "), quoting *People v. Parrott*, 40 Ill. App. 3d 328, 331, 352 N.E.2d 299 (1976). Recently, the seventh circuit determined:

> "Our society takes a very dim and undiscriminating view of street gangs. That jurors may automatically see in gang membership the taint of criminality is a real concern. The Illinois courts have recognized that evidence of gang association may have an unduly suggestive and distorting effect on a jury." *Gardner v. Barnett*, 175 F.3d 580, 589 (7th Cir. 1999).

In making our decision in this case, we find *Gardner v. Barnett*, 175 F.3d 580, 588 (7th Cir. 1999), persuasive. The case began as *People v. Gardner*, where the first district affirmed the decision of the trial court. *People v. Gardner*, 282 Ill. App. 3d 209, 668 N.E.2d 125 (1996), cert. denied, 168 Ill. 2d 606, 671 N.E.2d 736 (1996).

The *Gardner* case was then reviewed in *Gardner v. Barnett*, No. 97—6840 (N.D. Ill. January 2, 1998), where defendant doubted the constitutionality of the *voir dire*. The question posed to potential

jurors in that case was "have you or any member of your immediate family ever had any direct involvement with a street gang" (*Gardner*, slip op. at 5), almost verbatim the question asked by the trial judge in the case at bar. The United States District Court of the Northern District of Illinois denied *habeas corpus* relief, stating that "although the U.S. Supreme Court has specifically recognized that the Constitution commands inquiries into certain biases (*e.g.*, race), bias against street gangs is not among them." *Gardner*, slip op. at 5. However, the Seventh Circuit Court of Appeals recently reversed the lower court's decision and found that "the trial court's questioning was insufficient to assure Gardner the adequate *voir dire* to which he is constitutionally entitled." *Gardner*, 175 F.3d at 590.

■ We conclude the procedure employed to test juror impartiality in the case at bar would not have revealed prejudice against gang members since the prospective jurors were asked only whether they or any member of their families had ever had any involvement with street gangs. In reference to the same question asked of the venire in *Gardner*, the court stated:

> "This strikes us as an unduly narrow approach. The potential for juror bias is by no means limited to direct or indirect involvement with street gangs. Like any other form of prejudice, gang bias may be born of perception as much as personal experience. Most potential jurors in Illinois (and their families) may have had no direct or indirect involvement with street gangs but many of them would probably hold opinions on the subject." *Gardner*, 175 F.3d at 589-90.

However, the State argues that if prospective jurors were biased against gangs, this single question would have elicited a positive response from them, alerting the judge that follow-up questions were appropriate. However, given the narrowness of the trial court's inquiry, "the offer of follow-up on any positive response was essentially meaningless." See *Gardner*, 175 F.3d at 590. A question should not depend upon the prospective juror to volunteer information that does not fall within the question's scope. See *Kingston v. Turner*, 115 Ill. 2d 445, 467, 505 N.E.2d 320, 330 (1987). In *Kingston v. Turner*, 115 Ill. 2d 445, 505 N.E.2d 320 (1987), plaintiff's counsel failed to ask two jurors about a particular bias, and the court refused to dismiss them for bias after the jury was empaneled and grant the motion for a new trial because:

> "it would place a duty upon prospective jurors to volunteer information regarding any relevant biases, prejudices, or interests they might possess even when it would not be natural to do so. This in turn would place an undue burden upon them of knowing which

prejudices, biases, and interests were relevant to a given cause of action. We decline to impose such a burden." *Kingston v. Turner*, 115 Ill. 2d at 467, 505 N.E.2d at 330.

The State further argues the addition of the last question asked to each prospective juror—"can you be fair to both sides here"—satisfied the probe regarding gang bias. However, it is a common question at the end of *voir dire* proceedings, and it refers to an overall determination of the prospective juror's state of mind. Since no question was asked during *voir dire* about bias toward gangs, this final question fails to encompass gang bias and, thus, is irrelevant to this discussion.

The State further argues that this court should overrule its holding in *Jimenez*, 284 Ill. App. 3d 908, 672 N.E.2d 914, if it stands for the proposition that there is a *per se* rule requiring the questioning of prospective jurors regarding gang bias. However, the court in *Jimenez* properly applied the abuse of discretion standard applicable to review of a *voir dire* examination in finding that "[o]nce the court decided to permit the prosecution to present evidence of defendant's gang affiliation, by denying defendant's motion *in limine*, 'the trial judge was under a clear duty to insure during *voir dire* that the jury selected [was] free from prejudice against the group.' " *Jimenez*, 284 Ill. App. 3d at 912, 672 N.E.2d at 917, quoting *People v. Beyea*, 38 Cal. App. 3d 176, 195, 113 Cal. Rptr. 254, 266 (1974). The court in *Jimenez* had refused to ask a single question on gang bias.

The *Jimenez* court was not seeking to supplant the trial court's discretion entirely in relation to questioning prospective jurors on gang bias. Instead, the court held that when street gangs are involved in a case, something more is required to insure defendant receives an impartial jury. Subsequently, the *Gardner* court proclaimed that not only does a court need to ask questions on the topic of gangs when gang members are directly involved in the case, but the questions must elicit "juror perception of and predisposition towards gangs." *Gardner*, 175 F.3d at 590. Thus, we agree that an adequate inquiry should include questions that confirm the ability of prospective jurors to put aside any feelings of gang bias and decide the case on the basis of the evidence presented. See *Gardner*, 175 F.3d at 590. The question posed by the trial court on the topic of gangs was insufficient to create a reasonable guarantee that any bias would be discovered.

The courts in *Jimenez* and *Gardner* both determined that a convincing factor in their decisions to reverse the defendants' convictions was the prevalence of evidence concerning gangs in each trial. In *Gardner*, the court stated that "the persona of the street gang ran like a thread through the fabric of the trial." *Gardner*, 175 F.3d at 589.

Similarly, in the present case, discussion of gang territory, gang

wars, and gang affiliation was prevalent. In fact, the State's two star witnesses were members of the Gangster Disciples, a rival gang in a "war" with the Black Disciples in February 1996. The State's theory of the case was that defendant, who was a Black Disciple, shot at James and Darryl Burnett, who were Gangster Disciples, in retaliation for Gangster Disciples shooting him in January 1996. The State surmised that defendant's work as an informant against Gangster Disciples was another way to retaliate against the Gangster Disciples for his injuries. On the other hand, the defense's theory was that James and Darryl Burnett's identification of defendant and subsequent testimony were supplied in retaliation for defendant's work as an informant against the Burnetts' fellow Gangster Disciples.

In wrapping up its case, the State argued in closing:

"And you remember the background, the gang evidence, the things that happened even before we get to February 12. Let's talk about that for a minute. What do we now know? We now know that this whole thing is over gang nonsense. The gang crap that controls our streets these days. That is what this whole thing is about. And we now know that this guy is a life long member of the BD's [Black Disciple's].

\* \* \*

This is what gangs do for a living, they get revenge. They spend all their time out there. They don't work. They don't go to school. They don't serve the community. They spend all their time plotting revenge and retaliation. You get shot, you got to shoot somebody. It's respect. It's your stature in the gang. You don't let it go by. And you know that that is so."

■ Finally, the State argues that any error was harmless because, even without defendant's additional questions, defendant had an adequate opportunity to reveal gang bias among prospective jurors. Harmless error rules are based on the notion that a defendant's interest in an error-free trial must be balanced against societal interests in finality and judicial economy. *People v. Simms*, 121 Ill. 2d 259, 275-76, 520 N.E.2d 308, 315 (1988); see *Chapman v. California*, 386 U.S. 18, 23-24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 827-28 (1967). Because the defendant's interests are heightened where a constitutional error is at issue, the burden shifts to the State to prove "beyond a reasonable doubt" that the error did not affect a given decision. *Simms*, 121 Ill. 2d at 276, 520 N.E.2d at 315. For the reasons stated above, the State failed to meet this burden and we cannot find the trial judge's error was harmless.

Since there is a strong and prevalent bias in our society against membership in gangs, and the prosecution successfully emphasized

the role of gangs as central to this case, identifying gang bias among the prospective jurors was essential for an adequate *voir dire*. See *Gardner*, 175 F.3d at 589-90. Therefore, we conclude that the trial court's questioning was insufficient to assure defendant the adequate *voir dire* to which he was constitutionally entitled. The trial court abused its discretion, and, thus, we reverse the decision of the trial court and remand for further proceedings.

Next, we will consider one of defendant's remaining issues on appeal as it is likely to arise on retrial. Defendant claims that he was denied effective assistance of counsel at trial because of a series of decisions by defense counsel concerning the testimony of prosecution witness Betty Burnett (Betty). Defendant contends Betty's testimony was improperly introduced as evidence of the prior consistent statements of her son James. Defendant argues that his trial counsel was ineffective because he should have objected to Betty's testimony, tendered a limiting instruction, and objected to the prosecutor's prejudicial remarks concerning Betty's testimony during closing arguments. The State maintains that defendant's representation was not ineffective because Betty's testimony was properly admitted as a prior consistent statement. Further, the State contends that any alleged ineffectiveness failed to affect the outcome of the trial because of the strength of the State's case.

■ We must determine whether the trial court erred by admitting a witness' prior consistent statement into evidence. Proof of a prior consistent statement by a witness is inadmissible unless it is made to rebut a charge or inference of recent fabrication or motive to testify falsely, so long as the prior statement is made before the alleged motive to fabricate existed. *People v. Ashford*, 121 Ill. 2d 55, 71, 520 N.E.2d 332, 338 (1988). Therefore, we must ascertain whether the witness is alleged to have had the same motive to fabricate at the time he made the prior consistent statement as he did at trial. *People v. Jones*, 293 Ill. App. 3d 119, 126, 687 N.E.2d 1128, 1132 (1997). "The prior consistent statement rebuts the inference of fabrication only if the motive to fabricate is shown *not* to exist at the time of the prior consistent statement." (Emphasis in original.) *Jones*, 293 Ill. App. 3d at 126, 687 N.E.2d at 1132. In this case, the proper analysis fails to support the admission of the prior consistent statement.

At trial, James Burnett testified that he saw defendant fire several shots at Darryl Burnett at the intersection of 120th and Perry on February 6, 1996. James also said that he saw defendant with another man shooting at Geary Dow on February 12, 1996. Furthermore, James testified that he eventually told police what he saw and came to testify because his mother said that he should. Darryl testified that on

340

February 9, 1996, he saw defendant in the back of a police car during a raid on the home of one of his fellow gang members. At that time, Betty brought him a copy of the police report that he and his brother filed concerning the shooting incident on February 6 to show to the officers.

In his cross-examination, defense counsel was intimating the two brothers fabricated their testimony on the stand. In response to this implication, the State successfully added Betty to its witness list. Betty testified as to her son James' prior statements implicating defendant in the shooting of the victim. However, we find that Betty's testimony did not rebut a charge of *recent* fabrication because defense counsel failed to make a showing that no motive to fabricate existed at the time James first implicated defendant in the shooting of the victim in this case. In fact, it is highly probable that the motive to fabricate, gang rivalry, existed well before the shooting in this case. Therefore, the court should bar Betty's prior consistent statement testimony on retrial. We decline to analyze the ineffective assistance of counsel allegation, since the case will be retried.

Accordingly, we reverse the judgment of the circuit court.

Reversed.

O'BRIEN, P.J., and O'MARA FROSSARD, J., concur.