Clarence GARDNER, Petitioner–
Appellant,

v.

Paul BARNETT, Warden, Danville
Correctional Center, Respondent–
Appellee.

No. 98–1314.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1999.

Reargued En Banc Sept. 22, 1999.

Decided Dec. 10, 1999.

Jeff S. Pitzer (argued), Chicago, IL, for Petitioner–Appellant.

Courtney D. Carter (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Respondent–Appellee.

Before POSNER, Chief Judge, and BAUER, CUDAHY, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, DIANE P. WOOD, EVANS and WILLIAMS*, Circuit Judges.

BAUER, Circuit Judge.

Joseph Waites, the student manager of the Calumet High School football team, was shot and killed when he and other members of the football team got into a street fight with local gang members. Clarence Gardner ("Gardner"), one of the gang members, was charged with first degree murder based upon a theory of accountability. He was tried, convicted and sentenced to 35 years in prison by a jury in the Circuit Court of Cook County. Claiming error in the court's voir dire process and error by the court in failing to permit him a brief recess in the trial to gain the attendance of a witness, Gardner appealed his conviction to the Illinois Appellate Court. The Illinois Appellate Court affirmed the conviction, and the Illinois Supreme Court denied his petition for leave to appeal. See People v. Gardner, 282 Ill.App.3d 209, 217 Ill.Dec. 940, 668 N.E.2d 125 (1st Dist.1996); 168 Ill.2d 606, 219 Ill.Dec. 569, 671 N.E.2d 736 (1996). Gardner's petition for habeas corpus to the District Court was also denied. See Gardner v. Barnett, 1998 WL 2838 (N.D.Ill. 1998). He appealed and a panel of this Court reversed, but upon the granting of Respondent's Petition for Rehearing that Order was vacated. This Court heard the matter en banc and now affirms the Dis-

* Judge Ann Claire Williams took no part in the consideration of this case.

trict Court's denial of Gardner's petition for habeas corpus relief.

## I. BACKGROUND

■ Gardner does not challenge the Illinois Appellate Court's statement of facts. Those facts are entitled to a presumption of correctness and we adopt them here. *Kines v. Godinez*, 7 F.3d 674, 677 (7th Cir.1993), *cert. denied*, 510 U.S. 1200, 114 S.Ct. 1314, 127 L.Ed.2d 664 (1994).

On October 28, 1993, Joseph Waites was fatally shot. The unfortunate events which led to his death began around 4:55 p.m. that day. Petitioner–Appellant Clarence Gardner was at 79th Street and Carpenter. The area of 79th and Carpenter, just a few blocks from the Calumet High School, was the territory of the Gangster Disciples and the Black Disciples, affiliated gangs. Beyond that was the territory of the rival gangs, the Vice Lords and the Blackstones. In between the gangs' territory was the neutral area between 79th Street and Calumet High. It was around this edge of the Gangster Disciples' territory and the neutral territory that the fight erupted.

As Gardner was at 79th and Carpenter, a car with two of his friends, "Tony" and "Meechie," drove up. Gardner, Tony and Meechie are all members of the Gangster Disciples. Tony and Meechie waved Gardner over to the car and got out to talk to him when he reached them. As they stood there they saw Joseph Waites and several other members of the Calumet High School football team walking down 80th and Carpenter. The group was walking toward Morgan, toward the Blackstone's territory. Meechie asked Gardner and Tony if the players were "hooks," i.e. whether they were members of the Blackstone gang. Neither Gardner nor Tony replied.

The three ran to the corner of 80th and Carpenter where they were joined by a fourth person, Andre Bridges. Bridges was a Black Disciple. The four then went to 80th and Morgan, where eleven or twelve members of the football team were present. Gardner asked one of the football players what was going on and was told that the football players were "having an egg fight." He replied "oh" and walked back toward 80th and Carpenter with the other three Disciples.

There were about fifteen Black Disciples waiting at the corner of 80th and Carpenter when Gardner, Tony, Meechie and Bridges got back. Immediately, Meechie and Tony ran back to Meechie's car and drove down Carpenter to 80th, where they parked the car in the middle of the block. Meechie got out and began walking toward the football players. His hands were in his pockets.[1]

Meechie charged the football players, grabbing one and igniting a full blown confrontation involving at least 50 youths. As this was happening, someone shouted "bust them folks" three or four times. "Bust them" is a street expression meaning "shoot them." Some of the football players began to flee. Joseph Waites tried to run away but as he was running, he fell, and was beaten by six Black Disciples. Gardner joined in and admittedly punched Joseph Waites in the chest three times. As Waites lay on the ground balled up, the Disciples continued beating him. The beating lasted until Meechie and Tony once again arrived in the car. Tony got out of the car with a .25 or a .22 automatic, approached Joseph Waites and told the other Disciples to move because he was "fitting to bust" Waites. Gardner understood this meant Tony was going to shoot Joseph Waites. Gardner said "bust him" and began to run away.

As Gardner was running away, Tony shot Joseph Waites four times. Gardner

---

1. In a statement given to the police, Gardner admitted that he knew that Meechie sometimes kept a gun in his car under the dash- board. Gardner had last seen it there three or four weeks before the shooting.

was later arrested and charged with first degree murder under a theory of accountability. In a statement given to the police, Gardner admitted the above facts and, importantly, the fact that he said "bust him" to Tony just before Tony shot and killed Joseph Waites.

Michael Waites (Joseph's brother) was present during the fight and testified at trial. Other members of the football team to testify at trial were Anthony Foster and Cantrell Davis. All three testified that the person shouting "bust them folks" as the brawl began was Clarence Gardner. Their individual testimonies further showed Clarence Gardner's involvement in and responsibility for Joseph Waites' death.

Michael Waites ("Michael") said that Gardner and ten to fifteen other gang members came up to the team. Gardner asked whether the players were "fitting to jump on some of his folks" and told Michael and another player to take off their hats, which they did. At this point, a blue car pulled up and stopped across the street. Two men got out. Gardner said to the two men "bust them folks." Gardner asked if the players were "hooks." The team said they were not and showed Gardner their football jerseys. Gardner, Michael testified, replied "fuck that shit, bust them." The driver of the car then swung at one of the players, and the other boy swung back. Gardner said "bust them" again and the team started to run. About five seconds later, Michael heard gunshots.

Anthony Foster ("Foster") testified that after telling Gardner they were not "hooks," Gardner told the driver of the blue car the team members were "hooks." Gardner then told the driver and his passenger to "bust at their ass." Foster knew that by this Gardner was telling the other gang members to shoot them.

Cantrell Davis similarly testified that Gardner told the car's driver and passenger the players were "hooks" even though they said they were not. He also testified that after that Gardner said "fuck that

folks shoot them, pop at them, bust at them, bust at them."

Gardner presented only one witness at trial, a police officer called to impeach minor aspects of Michael's, Foster's and Davis' testimony. He would have called one additional witness, Luther Donald ("Donald"), but Donald failed to appear in court when his testimony would have been presented. The trial court refused to continue the case over the weekend so that Donald could be brought in. Gardner did not testify.

## II. DISCUSSION

### A. Standard of Review

■ Federal courts may grant a writ of habeas corpus when a person is held in custody under a state court judgment in violation of the United States Constitution. 28 U.S.C. § 2254; *Kavanagh v. Berge*, 73 F.3d 733, 735 (7th Cir.1996). In order to merit federal habeas relief, a petitioner must establish that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). *See also Lindh v. Murphy*, 96 F.3d 856 (7th Cir.1996) *(en banc) rev'd on other grounds* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Otherwise, a petitioner must demonstrate that the state court decision was based on an unreasonable determination of the facts, given the evidence presented during the state court proceedings. 28 U.S.C. § 2254(d)(2). Where, as here, the district court denied habeas relief, we review the district court's findings of fact under a clearly erroneous standard and its legal conclusions de novo. *Neumann v. Jordan*, 84 F.3d 985, 987 (7th Cir.1996).

### B. Continuance

The trial began on Wednesday, February 15, 1995. By the middle of the afternoon on Friday, February 17th, the pros-

ecution rested. After calling the police officer who had taken the witness' statements, the defense ran out of witnesses. Gardner's lawyer told the court he had one more witness, Luther Donald, a football player and friend of the victim. Donald had promised to be in court that day but had gone to school instead.[2] Therefore, he requested a continuance to the next court day (which would have been Tuesday since Monday was a court holiday) in order to allow Donald to testify. When asked what Donald would testify to, defense counsel said:

> We expect him to say that he was present with other football players and that he saw this car come up with two people in it. And that he heard the words at that point bust him or shoot him. That it came from one of the people in the car neither of whom were seen.

The trial judge denied the motion for a continuance, saying:

> Let the record reflect that it is now 3:35. It appears to me on Friday—Monday is a court holiday. Tuesday we are 4 judges short. We have five jury trials, 2 judges to do it, myself and Judge Erickson * * * It seems to me that this witness' testimony is cumulative * * * including that somebody in the car said bust him. * * * [A]ll the witnesses have said this person got out of the car, said he wanted to bust him or something to that effect. It's already been said. And it's also opinion. * * * [I]f it was just one day tomorrow, that wouldn't be so bad. I don't want the jury out on this case for three days and coming in on the 4th especially in view of the Court's schedule and in view of the fact that this is cumulative.

■ The appellate court "express[ed its] uneasiness with the trial court's excessive concern about the next week's" trial schedule, but nonetheless determined that Donald's proposed testimony was not material and that its absence did not prejudice

Gardner's right to a fair trial. 282 Ill. App.3d 209, 215–216, 217 Ill.Dec. 940, 668 N.E.2d 125. The court correctly reasoned that "[w]hether Gardner said it once (as he admitted) or four times (as eyewitnesses testified), 'bust him' is a directive to shoot. We cannot see that Donald's testimony about the initial 'bust him' would have made any difference." 282 Ill.App.3d at 216, 217 Ill.Dec. 940, 668 N.E.2d 125. This type of harmless error analysis has been approved by the Supreme Court, *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (*citing Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)), and thus we cannot say that the Illinois Appellate Court's decision was contrary to or involved an unreasonable application of federal law.

The prosecution's theory at trial was that Gardner was the gang leader and it was his order to "bust" Joseph Waites that Tony was following when he shot Waites. Presumably, Gardner's attorney sought to counter this theory with Donald's testimony that someone (in addition to) Gardner used the words "bust him" during the melee. But, whether other orders were given as the fight started is of little help to the defense. Gardner admitted saying "bust him" as Tony was standing over Waites with a cocked gun. Immediately after Gardner gave the order to shoot, Tony fired four shots into Waites, killing him.

Gardner was tried and convicted under a theory of accountability. That statute provides that "[w]here two or more persons engage in a common criminal design or agreement, any acts in furtherance thereof by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts." 720 ILCS 5/5–2(c). Therefore, the fact that someone other than Gardner may have said "bust him" is not dispositive of Gardner's guilt.

---

2. The defense contends that Donald was under subpoena to appear in court that day.

But that cannot be confirmed. There is no subpoena in the record.

The proffered testimony was, as the appellate court correctly concluded, not material.

■ We are mindful, as the petitioner urges, that every defendant has a right to present witnesses in his defense. *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). But, that right is not unfettered and is within the discretion of the trial judge. The trial court's failure to grant a continuance to secure the presence of a witness will result in a writ of habeas corpus only if the defendant can demonstrate the possibility that the error caused the trial to be fundamentally unfair. *United States ex rel. Searcy v. Greer*, 768 F.2d 906, 912 (7th Cir. 1985). This Gardner cannot do.

To determine whether the trial court abused its discretion in denying the request for a continuance, thus rendering the trial fundamentally unfair, the court must determine (1) whether due diligence was exercised to secure the availability of the witness; (2) whether the witness would offer substantial favorable testimony; (3) whether the witness is both willing and available to testify; and (4) whether the defendant would be materially prejudiced by the denial of the continuance. *Id.* at 913. The appellate court considered these factors, although under the guise of state law, and quite correctly concluded "Donald's testimony about hearing 'bust him' from someone in the car would not have materially impeached any State witness. The eyewitness testimony and Gardner's own confession place the defendant squarely within a violent enterprise." *People v. Gardner*, 282 Ill.App.3d at 216, 217 Ill.Dec. 940, 668 N.E.2d 125. The appellate court, pursuant to its consideration of these factors, also concluded "[w]hether Gardner said it once or four times, 'bust him' is a directive to shoot. We cannot see that Donald's testimony about the initial 'bust him' would have made any difference." *Id.*

Having analyzed the same factors in its inquiry that this court would examine to determine whether the petitioner's rights to due process and a fair trial were violated, and having reached the same result, we cannot say that the Illinois court's determination was "contrary to, or involved an unreasonable application of clearly established federal law" or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). The judgment of the District Court denying the writ of habeas corpus on this issue is therefore affirmed.

## C. Voir Dire

■ Gardner also argues that he was deprived of his Sixth Amendment right to be tried by an impartial jury when the trial court refused to *voir dire* potential jurors on four out of five questions he submitted regarding potential bias against street gangs. The question asked by the trial court was "[h]ave you or any other member of your immediate family ever had any direct involvement with a street gang?" The court indicated that if any member of the *venire* responded affirmatively to that question it would follow up with additional questions.

Despite having said he would not ask the other proposed questions regarding street gangs, the trial judge did ask the additional question of whether anyone had an **indirect** involvement with street gangs. Only one gentleman answered positively. He was not selected for the jury even though another juror who had a potential bias because he had children who played on a high school football team was. These questions, in addition to the promise to follow-up on any affirmative responses, and the general admonishments about being able to follow the law and set aside any sympathy and prejudice in rendering judgment were sufficient to address the possibility of juror bias.

■ The conduct of *voir dire* is left to the trial court's sound discretion. *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). The litigants do not have a right to have a partic-

ular question asked. *Ham v. South Carolina*, 409 U.S. 524, 527, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). Although the Constitution does require inquiries into certain biases (such as race), *Ham*, 409 U.S. at 527, 93 S.Ct. 848, bias against street gangs is not among them. Thus, Gardner had no entitlement to the questions he proposed.

■ In the state courts of Illinois, however, a litigant is entitled to have the venire questioned as to potential biases against gang members. *People v. Jimenez*, 284 Ill.App.3d 908, 220 Ill.Dec. 97, 672 N.E.2d 914, 917 (1st Dist.1996). In that case, Jimenez's conviction was reversed because the trial court refused to ask **any** questions that could expose jurors' knowledge of or predisposition against gangs. *Id.* at 919.[3] Obviously, in our case, the situation is much different. The trial court here did ask questions to discover who among the panel had familiarity with gangs through experience. That line of questioning revealed only one prospective juror who had an "indirect" experience with gangs. Had there been any need to go any further with the questioning, the court indicated it would be willing to do so.

The Petitioner cites us to the *Jimenez* holding in a footnote of his brief. We note that *Jimenez* is state law and not binding upon this court. Nor do we believe it should be followed. The subject matter of gangs and the unlawful activities their members engage in is delicate and long inquiries can be more detrimental to a fair trial than serve to expose an unwarranted prejudice. Not only does it invite a trip through a mine field it can actually serve to educate some persons whose understanding of gangs is limited, and create prejudice where none existed before. Certainly, there are areas of suburbia where gangs and street crime are not pervasive and the only knowledge of gangs those citizens have is of hanging out with "the gang" after school. Or of getting their

friends ("the gang") together for an evening of reminiscing about "the good old days." In areas where this is the prevalent way of thinking, lengthy inquiries into possible predispositions against gangs is not necessary. Thus, unlike the state court in *Jimenez*, we believe the better way is to leave the matter to the sound discretion of the trial judge.

Federal habeas relief is only available where a petitioner establishes that the state court proceedings resulted in a decision that was "contrary to, or involved an unreasonable application of clearly established federal law" or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). Gardner fails to show the Illinois Appellate Court unreasonably applied federal law when it determined the trial judge's question was sufficient to address the issue of gang bias. Thus, relief is unwarranted on this claim.

### III. CONCLUSION

Although things did not turn out as Clarence Gardner wished, we do not believe that the errors about which he complains denied him a fair trial. They certainly do not rise to the level of constitutional violations and deprivation of due process. Accordingly, we affirm the District Court's denial of Clarence Gardner's petition for writ of habeas corpus.

CUDAHY, Circuit Judge, with whom ILANA DIAMOND ROVNER and DIANE P. WOOD, Circuit Judges, join, dissenting.

Clarence Gardner—at the time of the crime sixteen years old and with no criminal record—was convicted of first-degree murder on a theory of legal accountability. He did not pull the trigger; he did not supply the gun; nor did he bring the shooter to the scene of the crime. There is no evidence of any pre-arrangement to

---

**3.** The Illinois Supreme Court denied the petition for leave to appeal. 172 Ill.2d 559, 223

Ill.Dec. 198, 679 N.E.2d 383.

commit murder or evidence that the shooting could have been foretold by Gardner. The entire case is based on the theory, in the closing words of the prosecutor to the jury, that Gardner was the "guy in charge ... the one giving the orders ... the one that everyone [was] following." Comparing Gardner's position of command with that of Adolph Hitler, the prosecution noted that "Hitler never murdered anybody, never placed anybody inside those ovens" but "he was the one who gave the order."

To prove its case in the context of over seventy youths embroiled in a furious melee (R. vol. 4 at 63, 72; R. vol. 5 at 64–65),[1] the State produced three witnesses to testify that Gardner shouted "bust them folks" three or four times as the shooter and the man who supplied the gun (both of whom were noticeably older than Gardner (R. vol. 4 at 80–81)) approached the tumultuous scene, and the driver emerged from a blue car. The only witness the defense was able to present was a police detective who testified that, when the three gave statements to the police on the day of the shooting, nothing was said about Gardner as the source of the "bust em's." (R. vol. 5 at 117–19).

The witness, Luther Donald, that the defense was *not* allowed to present was not Gardner's friend. In fact, he was a member of the football team and a friend of the murdered youth, Joe Waites. (R. vol. 4 at 52, 77–78). But he had been interviewed by defense counsel and was prepared to testify that the "bust em's" shouted at the onset of the altercation came from *inside* the blue car (R. vol. 5 at 145–47), where Gardner never was at any time. (R. vol. 4 at 61, 74, 95, 116). The only people inside the blue car were the shooter and the man who supplied the gun (R. vol. 4 at 60–61; R. vol. 5 at 58, 63–64,

66), people who might very well have shouted their violent intentions. Luther Donald's testimony, therefore, would have been eminently credible and in stark contradiction of the State's witnesses. There would have been nothing cumulative about Donald's testimony, and it likely would have given the jury an entirely different slant on the murderous incident.

But the trial judge did not let Donald testify. Apparently, the fact that the issue arose on a Friday afternoon was decisive. The trial judge said, "If it were just for one day, tomorrow, that wouldn't be so bad." The trial court noted that there were "five jury trials" scheduled for the following court day (Tuesday), and the courthouse was "four judges short." For this reason, it denied the continuance permitting Donald's testimony. The Illinois Appellate Court expressed its "uneasiness with the trial court's excessive concern about the next week's schedule in the criminal court." *People v. Gardner*, 282 Ill.App.3d 209, 215–16, 217 Ill.Dec. 940, 668 N.E.2d 125 (1st Dist.1996). But uneasiness is not enough when the right to a fair trial is at stake. The denial of a continuance in these circumstances surely offends due process. In this first-degree murder case involving a sixteen-year-old defendant with no prior criminal convictions, refusing a defendant to bring to court his most critical witness, and basing that refusal on "scheduling" considerations is both shocking and unconstitutional. *See Chandler v. Fretag*, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4 (1954); *Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). Such "myopic insistence upon expeditiousness" cannot be tolerated, *Ungar, supra* at 589, 84 S.Ct. 841 (citing *Chandler, supra*), and the Courts of Appeals are in total agreement on this point.[2]

---

1. I cite to the trial transcript in the record on appeal as (R. vol. [volume number] at [page number]).

2. *See, e.g., United States v. Burns*, 898 F.2d 819, 821 (1st Cir.1990) (ordering a new trial "where defendant has been deprived of his

only witness" due to denial of continuance); *United States v. Clinger*, 681 F.2d 221, 224 (4th Cir.1982) (reversing denial of continuance sought by prosecution, emphasizing "the higher priority we place upon justice as opposed to judicial expediency"); *Hicks v. Wainwright*, 633 F.2d 1146, 1150 (5th Cir.

Donald's testimony was crucial because the source of the "bust em's" shouted at the *beginning* of the altercation, when the blue car arrived and the driver got out and started the confrontation, is pivotal in determining whether Gardner was a commander ordering an execution—as the State charges. Later, while the football players were fleeing, the shooter (who had apparently remained in the car) emerged, charged out of the automobile, cocked his gun and shouted at Gardner and the others to "move" because he was "fixing to bust" Joe Waites. (R. vol. 5 at 66–67). Another gang member, Buckeye Lee, chimed in, telling the shooter to "take care of his business." (*Id.* at 67). It was at this later point that Gardner admitted to saying "bust him" as he fled the scene and the shooter fired the fatal shots. (*Id.* at 67–68). But there is nothing to suggest that this later "bust him" was a command; it might have been posed as a question or blurted out in dismay. It was uttered only after the shooter had announced his intentions and had almost finished the business of killing Waites. (*Id.* at 66–68). That Gardner apparently echoed the shooter's words as he fled would hardly make him a commander in the field or lend substance to the Hitler analogy.

Of course, neither Donald nor the State's three witnesses would have had anything to say about this later stage of the confrontation. In fact, by that time, all four of them had moved on from the side of the fallen Waites. (R. vol. 4 at 77–78, 80, 111, 127–28). It was the earlier "bust em" shouts to which the State pointed as commands and that Donald would

have ascribed to persons other than Gardner. (R. vol. 5 at 146–47). Donald was present at that crucial time, and his testimony, rather than being cumulative, could have provided a complete picture for the jury. *See Enoch v. Hartigan,* 768 F.2d 161, 162–4 (7th Cir.1985) (affirming grant of habeas petition in part because testimony that would have provided an alternative explanation to the prosecution's theory of the case was found not to be cumulative). The refusal to hear him therefore offended due process and precluded a fair trial.

With respect to the *voir dire,* it is important to understand how pervasively the case was presented as a singular exhibition of gang violence. From start to finish, the prosecution emphasized the case's immersion in gang lore. The jury was told about Gardner's membership in the Gangster Disciples, his association with other gang members on the day of the shooting, the provocative "trash-talking" of the gang members and the gang-motivated confrontation, beating and eventual murder. The prosecution called for a veritable jihad against street gangs and hammered this theme home in rebuttal argument on closing:

> This case is about the stupidity of street gangs in Chicago. You have seen first hand why this country looks at Chicago with such disgust and disdain. It is because of GD's, because of folks like this seated right here.

> Some people have asked what can we do about this senseless violence, about these innocent victims that will die. There was an innocent victim in this case. He did nothing, nothing, nothing

1981) (affirming habeas relief because "the right of petitioner to present the witness outweighed any inconvenience that would have been caused by extending the trial by a few hours"); *Bennett v. Scroggy,* 793 F.2d 772, 776 (6th Cir.1986) (granting habeas petition based on trial court's denial of an overnight continuance); *Enoch v. Hartigan,* 768 F.2d 161, 162–64 (7th Cir.1985) (granting habeas petition where trial court denied amendment to witness list to present exculpatory testimony from newly-discovered witness); *United*

*States v. Pruett,* 788 F.2d 1395, 1397 (8th Cir.1986) (reversing weapons conviction where defendant was denied continuance to secure attendance of material witness who had left town to attend funeral); *United States v. Flynt,* 756 F.2d 1352, 1361–62 (9th Cir. 1985) (finding reversible error to deny defendant continuance to procure expert testimony); *Manlove v. Tansy,* 981 F.2d 473, 479 (10th Cir.1992) (affirming grant of habeas petition where defense was denied continuance to produce unavailable witness).

deserving to die. My God, we have to do something about that. Well today as jurors you have the rare privilege of being in a position to actually do something about gang violence in Chicago. With this as the context, it is difficult to understand why the only question that the trial court agreed to was "Have you or any member of your immediate family ever had any direct involvement with a street gang?" The trial court refused to ask four other questions, including "Would you be able to put aside any feeling you might have about gangs, and give the defendant a fair trial based on the evidence?" The reason given for the refusal was "I don't think it's relevant."

Perhaps the judge had in mind those unidentified sectors of suburbia to which the majority opinion disingenuously points as being back in the era of "Hail, hail, the gang's all here." We are confident, however, that, with heavy media emphasis over many years, no place in America is so insulated as not to have heard of gangs in their most ominous sense. In fact, gangs themselves have now penetrated to the most protected corners of suburbia.

Contrary to *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), and *Rosales–Lopez v. United States*, 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981), the trial court failed to conduct *voir dire* sufficient to identify jurors entertaining a bias against gangs and to provide enough information to enable the defense to use its peremptory challenges. *See also Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). Gang issues were inextricably bound up with the conduct of the trial, indeed exacerbated by the prosecution's trial strategy, and in such circumstances, a trial judge should specifically inquire into possible bias against gangs in order to insure an impartial jury. *See Ristaino, supra* at 596, 96 S.Ct. 1017; *Ham, supra*. Under the standards first announced in *Aldridge, supra* at 310, 51 S.Ct. 470, and most recently reiterated in *Morgan, supra* at 730, 112 S.Ct. 2222, the trial court failed to meet the "essential demands of fairness."

Though not controlling, it is of some interest that another panel of the Illinois Appellate Court, of the same district that reviewed the *Gardner* case, has, on the *voir dire* point, cited and quoted with approval our panel opinion (subsequently vacated) which found the *voir dire* in *Gardner* to be constitutionally inadequate. *See State v. Strain*, 306 Ill.App.3d 328, 335–36, 239 Ill.Dec. 516, 714 N.E.2d 74 (1st Dist. 1999). Thus, in another gang case, the *Strain* court said:

> We conclude the procedure employed to test juror impartiality in the case at bar would not have revealed prejudice against gang members since the prospective jurors were asked only whether they or members of their families had ever had any involvement with street gangs. . . . A question should not depend upon the prospective juror to volunteer information that does not fall within the question's scope.

*Id.* at 336, 239 Ill.Dec. 516, 714 N.E.2d 74. Thus, the very same analysis suggested by *Morgan* and *Rosales–Lopez* as matters of federal constitutional law has been adopted by Illinois.

Finally, I do not quarrel with the proposition that to merit habeas relief, Gardner must establish that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). *See also Lindh v. Murphy*, 96 F.3d 856 (7th Cir.1996) (en banc), *rev'd on other grounds* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

Here, the refusal of the trial court to hear from Luther Donald, the defendant's only fact witness, whose testimony would

have flatly contradicted the State's key witnesses, unreasonably applied the dictates of *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), *Chandler v. Fretag, supra,* and *Ungar v. Sarafite, supra,* and denied a fair trial. The refusal to conduct an adequate *voir dire* on the issue of bias related to gangs was an unreasonable application of the requirements of *Morgan v. Illinois, supra,* and *Rosales–Lopez v. United States, supra.*

For these reasons, I respectfully dissent.